SCM CORPORATION, Plaintiff,

v.

UNITED STATES (Brother International Corporation, Party-In-Interest), Defendant.

C.R.D. 80–2;  Court No. 77–4–00553.

United States Customs Court.

March 7, 1980.

Frederick L. Ikenson, Washington, D. C., for plaintiff.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Director, Commercial Litigation Branch, New York City (Sheila N. Ziff, New York City, on the brief), for defendant.

Tanaka Walders & Ritger, Washington, D. C. (H. William Tanaka, Lawrence R. Walders and Wesley K. Caine, Washington, D. C., on the briefs), for party-in-interest.

RE, Chief Judge:

In this American manufacturer's action, plaintiff, a domestic manufacturer of typewriters, seeks to review the negative injury determination of the International Trade Commission in *Portable Electric Typewriters From Japan*, Investigation No. AA 1921–145 under the Antidumping Act of 1921, as amended (19 U.S.C. §§ 160, *et seq.*

(1970)), ITC Pub. 732, 40 Fed.Reg. 27079 (1975).

■ In brief, under the Antidumping Act of 1921, a special dumping duty may be assessed upon imported merchandise that is being sold in the United States at less than its fair value. As stated in a prior opinion of the court in this case, an American manufacturer may file a petition with the Secretary of the Treasury to protest actual or threatened injury to an industry or the establishment of an industry. The Secretary has the duty to determine whether that class or kind of imported merchandise is being sold, or is likely to be sold in the United States or elsewhere, at less than fair value.

■ If the Secretary issues an affirmative finding of sales at less than fair value, the matter is referred to the International Trade Commission. The Commission must then determine whether an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the less than fair value sales. If the Commission makes an affirmative finding of injury or likelihood of an injury, the Secretary of the Treasury must publish in the Federal Register notice of his determination as well as the findings of the Commission. Under the Antidumping Act these administrative decisions comprise the "dumping findings." As a consequence of the findings of "dumping," the imported merchandise is assessed with an additional "special dumping duty."

In this action, after receipt of the plaintiff's petition, the Secretary of the Treasury initiated an investigation which resulted in the publication of a determination that sales of portable electric typewriters from Japan were being or were likely to be sold at less than fair value. Thereupon the International Trade Commission conducted its investigation and rendered a negative determination, i. e., that an industry in the United States is not being or likely to be injured, or prevented from being established, by reason of the less than fair value sales. In summary, the Commission

reached a negative injury determination, and therefore no dumping findings were published. See *SCM Corporation v. United States (Brother International Corporation, Party-in-Interest)*, 435 F.Supp. 1224, 1225–1226, 79 Cust.Ct. 163 (1977).

This case has a long history. See *SCM Corporation v. United States International Trade Commission et al.*, 404 F.Supp. 124 (D.D.C.1975); *Id.*, 549 F.2d 812 (D.C.Cir. 1977) (reversing the dismissal by the district court, and remanding with instruction to retain jurisdiction until SCM brought action in the United States Customs Court to enable the Customs Court to determine whether it had jurisdiction to review a negative injury determination of the ITC in an American manufacturer's action under section 516 of the Tariff Act of 1930, as amended); *SCM Corporation v. United States (Brother International Corporation, Party-in-Interest)*, 435 F.Supp. 1224, 79 Cust.Ct. 163 (1977) (motion for a three-judge panel denied); *Id.*, 450 F.Supp. 1178, 80 Cust.Ct. 226 (1978) (upheld jurisdiction in the United States Customs Court); *Id.*, 81 Cust.Ct. 159, C.R.D. 78–13 (1978) (motion for discovery); *Id.*, 473 F.Supp. 791, 82 Cust.Ct. 351 (1979) (claim of executive privilege).

What is sought to be reviewed by the present cross-motions for summary judgment by plaintiff and defendant, respectively, is the negative injury determination made by the International Trade Commission. Specifically, plaintiff contends that the ITC erred in its interpretation of the term "injury," as it appears in the Antidumping Act of 1921. 19 U.S.C. § 160(a).

This is not the first case in this court which presents questions as to the scope and standard of judicial review of administrative determinations during dumping proceedings. This case, however, in addition to the scope and standard of review to be applied to an ITC negative injury determination, raises the question of the degree of specificity required by that determination in order that it may be properly reviewed by the court.

The scope or standard of judicial review of administrative action is often set forth in the applicable statute. No provision, however, is made in the case of judicial review of an ITC injury determination in a dumping proceeding. Although the Trade Agreements Act of 1979 provides that the Commission's final determinations, such as the one now before this court, are subject to judicial review under a "substantial evidence" test, the present action was commenced prior to the enactment of that provision.

Nevertheless, in a series of decisions, the Court of Customs and Patent Appeals has established that the scope of review applicable to the determinations of the United States Tariff Commission,[1] the predecessor of the ITC, is limited to whether the Commission acted within its delegated authority, correctly interpreted the statute, and correctly applied the law. *Kleberg v. United States*, 71 F.2d 332, 21 CCPA 110, T.D. 46446 (1933); *City Lumber Co. v. United States*, 311 F.Supp. 340, 64 Cust.Ct. 826 (1970), *aff'd*, 457 F.2d 991, 59 CCPA 89 (1972); *Imbert Imports v. United States*, 475 F.2d 1189, 60 CCPA 123 (1973). See also recent discussion by Judge Newman in *Armstrong Bros. Tool Co. et al. v. United States, etc.*, 84 Cust.Ct. ——, 483 F.Supp. 312 (1980), *appeal pending*. In the case at bar, the fundamental question presented is whether the ITC correctly interpreted and applied the Antidumping Act of 1921 in making its negative injury determination.

In defining the proper role of judicial review of administrative action involving the exercise of discretion, the Supreme Court has stated that:

"In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citi-*

---

1. Renamed the United States International Trade Commission by section 171(a) of the Trade Act of 1974 (19 U.S.C. § 2231(a)) (1979).

zens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971).

In *Overton Park*, the question presented was whether the action of the Secretary of Transportation, pertaining to the construction of an interstate highway through a public park in Tennessee, was invalid without formal findings. The lower courts held, and the Supreme Court agreed, that, under the governing statute, the agency determination did not require formal findings; and, that the only hearing required was "nonadjudicatory, quasi-legislative" in nature. Nevertheless, the Supreme Court held that, even under the arbitrary and capricious standard of review, the reviewing court is required "to engage in substantial inquiry." The review function was explained as follows:

"Certainly, the Secretary's decision is entitled to a presumption of regularity. [Citations.] But that presumption is not to shield his action from thorough, probing, in-depth review.

.    .    .    .    .

"Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. .  .  . To make this finding [that the determination was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law] the court must consider whether the decision was based on *a consideration of the relevant factors* and whether there has been a clear error of judgment. .  .  . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency." (Emphasis added.) 401 U.S. at 415–416, 91 S.Ct. at 823–824.

When the administrative determination is not based upon a record, courts have limited the scope of their inquiry to the administering authority's statement of the reasons for its determination. See cases cited in *Suwannee Steamship Co. v. United States*, 435 F.Supp. 389, 392–393, 79 Cust.Ct. 19 (1977).

Thus, in *Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), the Supreme Court required the agency [the Secretary of Labor] to provide a statement of reasons, and the essential facts upon which the decision was based, even though neither the statute nor its legislative history said anything about either findings or reasons.

The Court reasoned that since a reviewing court was not authorized to substitute its judgment for that of the agency, the agency must indicate explicitly the basis upon which the discretionary action was taken. This will enable the court to determine, with a degree of certainty, whether or not the discretionary action taken by the agency was exercised in a manner that was neither arbitrary nor capricious. See *Dunlop v. Bachowski*, 421 U.S. at 571–572, 95 S.Ct. at 1859–1860, *citing De Vito v. Shultz*, 300 F.Supp. 381, 383 (D.D.C.1969).

■ Accordingly, however narrow the standard of judicial review, the Commission's determination is not shielded from a "thorough, probing, in-depth review." Furthermore, the court is required to engage in a "searching and careful" inquiry into the facts.

To perform the function of meaningful judicial review, the court requires the assistance and collaboration of the administrative agency. The cooperative effort of agency and court, and the necessity for "principled decision-making," was stated as follows by Chief Judge Bazelon in *Environmental Defense Fund Inc. v. Ruckelshaus*, 439 F.2d 584 (D.C.Cir.1971):

"We stand on the threshold of a new era in the history of long and fruitful collaboration of administrative agencies and reviewing courts.

.    .    .    .    .

"Judicial review must operate to ensure that the administrative process itself will confine and control the exercise of discretion. Courts should require administrative officers to articulate the standards and principles that govern their discretionary decisions in as much detail as

possible. . . . When administrators provide a framework for principled decision-making, the result will be to diminish the importance of judicial review by enhancing the integrity of the administrative process, and to improve the quality of judicial review in those cases where judicial review is sought." 439 F.2d at 597–598.

Judge Leventhal, writing for the same court, has referred to the "salutary principle of judicial restraint" combined with "an awareness that agencies and courts together constitute a 'partnership' in furtherance of the public interest." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir.1970), *cert. den.*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). He noted that although a court may defer to administrative expertise, it must nevertheless undertake a study of the record "to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." 444 F.2d at 850.

■ The following statements from the *Greater Boston Television Corp.* case are particularly applicable here:

"The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues. This calls for insistence that the agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts, a course that tends to assure that the agency's policies effectuate general standards, applied without unreasonable discrimination." 444 F.2d at 851.

In the case of administrative action based upon a record, courts have engaged in close scrutiny of that record, especially with reference to technical and specialized matters, in order to review the administrative action in issue. *Ethyl Corporation v. Environmental Protection Agency*, 541 F.2d 1 (D.C.Cir. 1976), *cert. den.*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). In an extensive discussion pertaining to the proper application of the "arbitrary and capricious" standard of review, in the *Ethyl Corporation* case the Court of Appeals for the District of Columbia stated:

"This standard of review is a highly deferential one. It presumes agency action to be valid. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136. [Citations.] Moreover, it forbids the Court's substituting its judgment for that of the agency, *Citizens to Preserve Overton Park v. Volpe*, [*supra*,] . . ., and requires affirmance if a rational basis exists for the agency's decision. [Citations.]

"This is not to say, however, that we must rubber-stamp the agency decision as correct. To do so would render the appellate process a superfluous (although time-consuming) ritual."

The court continued:

"There is no inconsistency between the deferential standard of review and the requirement that the reviewing court involve itself in even the most complex evidentiary matters; rather, the two indicia of arbitrary and capricious review stand in careful balance. The close scrutiny of the evidence is intended to educate the court. . . . The enforced education into the intricacies of the problem before the agency is not designed to enable the court to become a superagency that can supplant the agency's expert decision-maker. To the contrary, the court must give due deference to the agency's ability to rely on its own developed expertise. *Market Street Railway v. Railroad Commission*, 324 U.S. 548, 559–561, 65 S.Ct. 770, 776–777, 89 L.Ed. 1171 . . . ." 541 F.2d at 34–36.

Concurring in the *Ethyl Corp.* case, Judge Leventhal, in an analysis of the role of a court in reviewing a challenge of technical administrative determinations, wrote:

"The aim of the judges is not to exercise expertise or decide technical questions, but simply to gain sufficient background orientation. . . . When called upon to make de novo decisions, individual judges have had to acquire the learning pertinent to complex technical questions in such fields as economics, sci-

ence, technology and psychology. Our role is not as demanding when we are engaged in review of agency decisions, where we exercise restraint, and affirm even if we would have decided otherwise so long as the agency's decision-making is not irrational or discriminatory.

"The substantive review of administrative action is modest, but *it cannot be carried out in a vacuum of understanding.* Better no judicial review at all than a charade that gives the imprimatur without the substance of judicial confirmation that the agency is not acting unreasonably." (Emphasis added.) 541 F.2d at 69.

It is obvious that a reviewing court cannot perform its function if the administrative agency, here the ITC, has not properly discharged its responsibility which "flows naturally from the functional relationship existing between reviewing court and administrative agency." *Public Media Center v. FCC,* 587 F.2d 1322 (D.C.Cir.1978). Judge Tamm, quoting from *American Smelting & Refining Co. v. FPC,* D.C.Cir., 494 F.2d 925, 945, *cert. den.,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122, emphasized that "the failure of an administrative agency to articulate the reasons for a particular decision makes meaningful review of that decision impossible." He added that a "reviewing court must be presented with the rationale underlying the importance of factual distinctions as well as the factual distinctions themselves." 587 F.2d at 1331–1332.

These principles of judicial review of administrative determinations, as developed by case law, are especially pertinent to determinations made by the ITC.

In the 1958 amendments to the Antidumping Act, Congress directed the Commission, then the Tariff Commission, to publish its injury determination, "with a statement of the reasons therefor, whether such determination is in the affirmative or in the negative." Pub.L. 85–630, § 1(3), 72 Stat. 583 (1958) (19 U.S.C. § 160(c)).

The congressional intent, for including the requirement of a statement of reasons in a Commission determination, is explained in the legislative history of the 1958 amendments to the Antidumping Act:

"*Provision is also made for published notice of decisions, whether affirmative or negative, with reasons therefor.* The Treasury Department will be required to publish such reports on its determinations with respect to sales at less than fair value and the Tariff Commission will be required to publish such reports on its determinations with respect to injury. *In the past there has been no established practice on this point, except that United States Tariff Commission decisions have been published, sometimes with, sometimes without reasons.* Mandatory publication will enable all concerned to know what are the developments in connection with the Antidumping Act, and what types of cases are being found within or without the scope of its application." (Emphasis added.) S.R. 85–1619, U.S. Code Cong. & Admin.News, 1958, Vol. 2, p. 3501.

The Trade Act of 1974, which substantially revised the antidumping law, embodies a dual statutory command for the International Trade Commission. Thus, section 201(d) of the Antidumping Act of 1921 provides:

"(2) The Secretary, upon determining whether foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and the Commission, upon making its determination under subsection (a) of this section, shall publish in the Federal Register such determination, whether affirmative or negative, *together with a complete statement of findings and conclusions, and the reasons or bases therefor,* on all the material issues of fact or law presented (consistent with confidential treatment granted by the Secretary or the Commission, as the case may be, in the course of making its determination)." (Emphasis added.) Pub.L. 93–618, § 321(a)(2), 88 Stat. 2041, 2043 (1974) (19 U.S.C. § 160(d)(2)).

The statute explicitly directs the Commission to include in its determination a *complete* statement of findings and conclusions,

*and* the reasons or bases for those findings and conclusions.

The language used in this two-fold statutory command is patterned after the Administrative Procedure Act, 5 U.S.C. § 557(c), which requires that certain administrative decisions include a statement of "findings and conclusions, and the reasons or basis therefor." To this APA language, Congress, in the Trade Act of 1974, added the word "complete" to make clear its intention concerning ITC determinations.

In the legislative history of the Trade Act of 1974, the Senate Finance Committee indicated the intended purpose of the additional statutory requirement for a "complete" statement of findings and conclusions:

> "*Complete Statement of Determinations.*—Section 201(c)(2) of the Act, as amended by the House bill, would require the Secretary, upon making his LTFV sales determination, and the Commission, upon making its injury determination under the Act, to publish such determinations in the Federal Register and include a statement of findings and conclusions, and the reasons or bases thereof, on all material issues of fact or law presented. The Committee amended this provision (section 201(d)(2) of the Act under the Committee bill) to require that the statement published be a *complete* statement, and to permit procedures consistent with confidential treatment granted by the Secretary or the Commission. *In adding the word 'complete' to the bill, the Committee is making clear its intent that sufficient information be provided in the case of each determination to enable all interested parties to be aware of the reasons for, and details of, such determinations and to effectively protect their rights in proceedings before the Department of the Treasury and the Commission, as well as in the courts."* (Emphasis added.) S.R. 93–1298 at 171, U.S.Code Cong. & Admin.News, 1974, Vol. 4, pp. 7186, 7308.

Elsewhere in its Report, the Finance Committee again expressly indicated its expectations concerning the required clarity of these determinations:

> "The Committee believes strongly that Commission determinations under this and other statutes, ought to be clear, well documented, and, nearly as possible, decisive." S.R. 93–1298 at 121, U.S.Code Cong. & Admin.News, p. 7265.

Although this action was commenced prior to the enactment of the Trade Agreements Act of 1979, its legislative history, nevertheless, indicates a continuing congressional intention to require ITC determinations to be sufficiently specific to enable the courts to determine whether the facts support the findings.

In considering the proposed Trade Agreements Act of 1979, the House Committee on Ways and Means reviewed the affirmative and negative decisions of the ITC over the past five years. The Committee concluded that the decisions, on the whole, have been consistent with a "material injury" test, and expressed its intention to have that standard continue. Significantly, the Committee noted:

> "However, this statement does not indicate approval of all the affirmative or negative decisions of the ITC with respect to the issue of injury, *as judgments as to whether the facts in a particular case actually support a finding of injury are for the ITC and the courts to determine."* (Emphasis added.) H.R. 96–317 at 46 (1979).

The Committee also expressed its expectations on the specificity required of determinations made by the ITC:

> "It is expected that in its investigation the ITC will continue to focus on the conditions of trade and development within the industry concerned. For one industry, an apparently small volume of imports may have a significant impact on the market; for another the same volume might not be significant. Similarly, for one type of product, price may be the key factor in determining the amount of sales elasticity, and a small price differential resulting from the amount of the subsidy or the margin of dumping can be deci-

sive; in others the size of the margin may be of lesser significance. *For this reason the Committee intends that the ITC determination, as well as any dissenting or separate views of the individual Commissioners, be specific in its statement of findings of fact and conclusions of law."* (Emphasis added.) *Ibid.*

Whenever reasons are required of administrators for their decisions, the Supreme Court has indicated the purpose for the articulation of reasons, and the degree of specificity required in the statement of reasons.

In *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), the Supreme Court reaffirmed the rule of the *Chenery* cases, *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), and stated:

"[T]his Court has relied on the 'simple but fundamental rule of administrative law,' *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), that the agency must set forth clearly the grounds on which it acted. For '[w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong.' *United States v. Chicago, M., St. P. & P. R. Co.*, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935). See also *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197, 61 S.Ct. 845, 853, 85 L.Ed. 1271 (1941); *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). And we must rely on the rationale adopted by the agency if we are to guarantee the integrity of the administrative process. *Id.*, at 88, 63 S.Ct. at 459." 412 U.S. at 807, 93 S.Ct. at 2374–75.

Significantly, in *Atchison* the Supreme Court recognized that even where the court's review is limited (as in Interstate Commerce Commission rate cases), the court, nevertheless, "must be able to discern in the Commission's actions the policy it is now pursuing, so that it may complete the task of judicial review—in this regard, to determine whether the Commission's policies are consistent with its mandate from Congress." 412 U.S. at 805–806, 93 S.Ct. at 2374.

*Schaffer Transportation Co. v. United States*, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957), teaches that even when Congress has given wide authority to a Commission, it is the duty of a reviewing court to insure that the Commission's actions are harmonious with the national policy expressed in the enabling act. In the language of the Supreme Court:

"To see whether those policies have been implemented we look to the Commission's own summary of the evidence, and particularly to the findings, formal or otherwise, which the Commission has made. Just as we would overstep our duty by undertaking to evaluate the evidence according to our own notions of the public interest, we would shirk our duty were we summarily to approve the Commission's evaluation of the record without determining that the agency's evaluation had been made in accordance with the mandate of Congress." 355 U.S. at 88, 78 S.Ct. at 176–77.

Although Mr. Justice Frankfurter dissented in *Schaffer*, and stated that Congress gave the Commission the widest area for exercising its experience and left very little room for judicial review, he nevertheless expressed the view that the majority opinion:

". . . may serve a useful purpose if it will lead the Interstate Commerce Commission, despite its enormous volume of business, to *a more detailed and illuminating formulation of the reasons for the judgment that it reaches* even in that class of cases where Congress has relied on the Commission's discretion in enforcing the most broadly expressed congressional policy. Since the orders in such cases also fall under judicial scrutiny, it is desirable to insist upon precision in the findings and the reasons for the Commission's action." (Emphasis added.) 355 U.S. at 95, 78 S.Ct. at 180.

More recently, the Supreme Court in *Bowman Transportation, Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) referred to its decision in the second *Chenery* case (332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)) and said that it would "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." In *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), the Supreme Court, however, indicated that it would not uphold a decision if the agency did not "articulate any rational connection between the facts found and the choice made."

In *Burlington*, Mr. Justice White, in reviewing an order of the Interstate Commerce Commission, observed that:

> "There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. . . . Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with *no* practical limits on its discretion.' *New York v. United States*, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (dissenting opinion)." (Emphasis in original.) 371 U.S. at 167, 83 S.Ct. at 245.

The rationale for requiring an agency to articulate its reasons has been expressed by the United States Court of Appeals for the District of Columbia. Distinguishing between findings and reasons, the court, in *Citizens Association of Georgetown, Inc. v. Zoning Commission of the District of Columbia*, 477 F.2d 402 (D.C.Cir.1973), stated:

> "Reasons differ from findings in that reasons relate to law, policy, and discretion rather than to facts and even where findings are not required, a disclosure of an agency's reasons is often desirable." 477 F.2d at 409.

More recently, that court, in *Matlovich v. Secretary of the Air Force*, 591 F.2d 852, 857 (D.C.Cir.1978), highlighted "the need for the court, and the complaining party, to be given some helpful insight into the agency's reasoning."

In cases in which an administrative agency's determination must include the agency's "findings," the courts distinguish between basic findings and ultimate findings.

The Supreme Court has stated that, "[t]he ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact." *Helvering v. Tex-Penn Oil Co.*, 300 U.S. 481, 491, 57 S.Ct. 569, 574, 81 L.Ed. 755 (1937).

■ It is not sufficient if an administrative decision states only ultimate findings. The decision must include "the evidential, rather than the ultimate facts; that is to say, the primary facts from which, through a process of reasoning and inference, the ultimate facts may be determined." *Meeker v. Lehigh Valley R. Co.*, 236 U.S. 412, 427, 35 S.Ct. 328, 334, 59 L.Ed. 644 (1915). An ultimate finding in the statutory language is not enough in the absence of a basic finding to support it. *United States v. Pierce Auto Lines*, 327 U.S. 515, 533, 66 S.Ct. 687, 696, 90 L.Ed. 821 (1946).

■ Basic findings, those which support the ultimate findings, must be more detailed than the ultimate findings. In the words of the Supreme Court:

> "We have repeatedly emphasized the need for clarity and completeness in the basic or essential findings on which administrative orders rest. [Citations.]" *Colorado-Wyoming Gas Co. v. FPC*, 324 U.S. 626, 634, 65 S.Ct. 850, 854, 89 L.Ed. 1235 (1945). See also *Morgan v. United States*, 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288 (1936).

In his treatise on *Administrative Law*, Vol. 2, § 16.06, Professor Davis explains:

> "An ultimate fact is usually expressed in the language of a statutory standard. Examples: the rate is reasonable; the applicant is fit, willing and able to provide the service; the action is in the public interest; the respondent has refused to bargain collectively; the injury occurred in the course of employment.

"The basic findings are those on which the ultimate finding rests; the basic findings are more detailed than the ultimate finding but less detailed than a summary of the evidence."

The distinction between basic or underlying facts, and ultimate facts, was described in *Saginaw Broadcasting Co. v. FCC*, 96 F.2d 554 (D.C.Cir.1938), *cert. den.*, 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938). In *Saginaw*, the Court of Appeals for the District of Columbia Circuit stated:

"In discussing the necessary content of findings of fact, it will be helpful to spell out the process which a commission properly follows in reaching a decision. The process necessarily includes at least four parts: (1) evidence must be taken and weighed, both as to its accuracy and credibility; (2) from attentive consideration of this evidence a determination of facts of a basic or underlying nature must be reached; (3) from these basic facts the ultimate facts, usually in the language of the statute, are to be inferred, or not, as the case may be; (4) from this finding the decision will follow by the application of the statutory criterion." 96 F.2d at 559.

These authorities, together with the specific statutory directions pertaining to ITC determinations, establish the criteria against which the ITC's no-injury determination may be tested in determining whether the agency decision is adequate to enable this court to perform its review function.

In this case, the ITC's determination was based upon information it gathered upon its own initiative, as well as upon a hearing in which the parties appeared with counsel. At the hearing, evidence was taken, testimony was given under oath, the parties had the opportunity to cross-examine witnesses,[2] and a full transcript of the proceedings was made. Consequently, the ITC determination was at least partially made upon the basis of a record. Clearly, under the pertinent authorities, the court may scrutinize the record closely in order to perform its function of judicial review. See, e. g., *Ethyl Corporation v. Environmental Protection Agency, supra.*

The ITC, by a vote of 3 to 2, with one commissioner abstaining, determined that an industry in the United States is not being injured or is not likely to be injured by reason of the importation and sale at less than fair value of portable electric typewriters from Japan.

In support of its no-injury conclusion, the majority, in its "Statement of Reasons," addressed two issues relevant here:

1. What is the "industry" most likely to be affected by the imported electric typewriters?

2. Is import penetration of a market alone a basis for finding "injury"?

The legislative history of the Trade Act of 1974 is set out in *U. S. Code Congressional and Administrative News*, 1974, Vol. 4, pp. 7186, *et seq.* and includes S.R. 93–1298 of the Senate Finance Committee. In discussing the concepts of "injury" and "industry," the Finance Committee explained.

"*Certain Concepts and Terms Associated with Antidumping Act Practices.*—The Committee received proposals to include statutory language regarding certain concepts and terms, such as 'technical dumping,' industry, injury, causation linkages, and reconsideration of agency determinations and findings, embodied in the Antidumping Act. These proposals were not accepted for the reason that the Committee believes the matters involved are adequately treated under existing practices and are best left to individual case determinations without additional statutory guidelines.

    .        .        .        .        .

2. In *Pasco Terminals, Inc. v. United States*, 477 F.Supp. 201, 83 Cust.Ct. —— (1979), *appeal pending*, Judge Maletz emphasized the fact-finding nature of ITC proceedings in order to support his determination that the parties had no *right* to confrontation and to cross-examination. *Id.* at 213, 216. In the present case, in which the parties to the ITC proceedings were accorded opportunity to confront adverse witnesses and cross-examine them, the record that was produced is properly before the court.

"Conceptually, the Antidumping Act is not directed toward forcing foreign suppliers to sell in the U. S. market at the same prices that they sell at in their home markets. Rather, the Act is primarily concerned with the situation in which the margin of dumping contributes to underselling the U. S. product in the domestic market, resulting in injury or likelihood of injury to a domestic industry. *Such injury may be manifested by such indicators as suppression or depression of prices, loss of customers, and penetration of the U. S. market.* When clear indication of injury, or likelihood of injury, exists there would be reason for making an affirmative determination. The Antidumping Act is designed to discourage and prevent foreign suppliers from using unfair price discrimination practices to the detriment of a United States industry." (Emphasis added.)

.     .     .     .     .

"The Antidumping Act refers to 'an industry in the United States.' There are no qualifications as to the kind of industry or the number of industries that might be adversely affected by the less-than-fair-value imports under consideration. Although the Commission's investigations have usually been concerned with an industry consisting of the domestic-producer facilities engaged in the production of comparable articles (i.e., articles like the imported articles), a number of investigations have been concerned with the domestic facilities engaged in the production of articles which, although unlike the imports, are nevertheless competitive therewith in domestic markets. In any case, the industry is a national industry involving all domestic facilities engaged in the production of the domestic articles involved." S.R. 93–1298 at pp. 178–180, U.S.Code Cong. & Admin.News 1974, p. 7315.

The majority did not specifically refer to, or rely upon, the "indicators" of injury mentioned in the Finance Committee Re-

port. Nevertheless, it discussed "import penetration of the U. S. market," and "acknowledged" that the imports of portable *electric* typewriters from Japan, sold at less than fair value, obtained a "significant share of the U. S. market for portable typewriters."

The majority, in addressing the issue of market penetration, considered the relevant market to be the market "for portable typewriters," apparently encompassing *all* portable typewriters including both electric and manual. Since SCM was the sole domestic producer of portable typewriters, both electric and manual, it was perforce the sole domestic supplier of the U. S. market for portable typewriters.

As a factor to be considered in determining injury to an industry, the issue pertaining to import penetration of a market is of obvious significance. Together with suppression or depression of prices and loss of customers, market penetration is one of the three "indicators" of injury specifically mentioned in the Senate Finance Committee report previously quoted.

What is not clear to the court is whether all three indicators, any one of them, or any combination of more than one, must be found before there is adequate reason for making an affirmative injury determination.

Notwithstanding the "acknowledged" fact that the less than fair value imports obtain a "significant share" of the United States market, the majority concluded that "imports penetration alone is not an adequate basis for determining injury."

There is nothing stated in the majority's "Statement of Reasons" to explain that conclusion. The statement that "imports penetration alone" is not an adequate basis for an injury determination may or may not be consistent with legislative intent. Absent a clear articulation of the reasons which led to that conclusion, the court cannot determine whether the ITC has exercised its discretion in a manner which nei-

ther deviates from nor does violence to the manifest legislative intent.[3]

The majority, in response to the "what is the industry" issue, considered two alternatives: either facilities devoted to the production of only portable *electric* typewriters; or, facilities devoted to the production of *all* portable typewriters, both electric and manual. In either instance, the "industry" consisted of the facilities of SCM Corporation, the sole U. S. producer of portable electric and portable manual typewriters. On this issue the majority concluded:

"Our determination in this case would be the same irrespective of whether we considered the U. S. industry to consist of the facilities used in the production of all portable typewriters or only portable electric typewriters." 40 Fed.Reg. 27080 (1975).

SCM contends that the ITC erred in failing to consider a third alternative industry, facilities devoted to the production of only portable *manual* typewriters, as a separate industry.

As it appears, there were three alternative industries which could have been considered by the ITC: all portable typewriters, both electric and manual; only portable *electric* typewriters; or only portable *manual* typewriters. In reaching its conclusion as to what was the affected "industry," the majority considered the first two alternatives, but not the third.

The majority in its "Statement of Reasons" sets forth neither findings nor reasons to explain why it limited its choice of "industry" to only two of the three alternatives, and why it excluded from its consideration the portable *manual* typewriter "industry." Hence, the court is not able to determine whether or not the ITC exercised a reasoned discretion consistent with the ascertainable legislative intent pertaining to an affected "industry" within the meaning of the Antidumping Act.

Government counsel, in its brief, attempts to supply the reasons missing from the ITC determination by arguing that, due to SCM's dominant position in the domestic portable typewriter industry, it could shift production from portable electric to portable manual typewriters in response to market alterations. Therefore, it submits that the ITC's determination, that *all* portable typewriter production is an industry, was appropriate.

The obvious answer to government counsel's argument is that it is, at best, a "post hoc rationalization" by counsel which is unacceptable, and cannot be used as a substitute for the ITC's absent or missing reasoning. The Supreme Court has repeatedly refused to accept the arguments of an agency's counsel in appraising the validity of the agency's decisions.

"For the courts to substitute their or counsel's discretion for that of the Commission is incompatible with the orderly functioning of the process of judicial review. This is not to deprecate, but to vindicate . . . the administrative process, for the purpose of the rule is to avoid 'propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency.' 332 U.S., at 196, 67 S.Ct., at 1577, 91 L.Ed. 1995. [*Securities Commission v. Chenery Corp.*]" *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

---

**3.** At a Symposium on the Tokyo Round of Multilateral Trade Negotiations (MTN), it was observed that the role of lawyers is to insure that "administrative procedures fully reveal the facts and reasoning upon which official governmental decisions are based, and that judicial review is rigorous and meaningful." Herzstein, "The Role of Law and Lawyers Under the New Multilateral Trade Agreement," in 9 *Georgia Journal of International and Comparative Law* 177, 205 (1979). In commenting upon the procedural changes made in antidumping proceedings by the Trade Act of 1974, special reference was made to the "more detailed determinations" required under that Act. See address by Deputy Assistant Secretary Suchman, March 11, 1975, before the International Trade Committee of the Federal Bar Association, Washington, D.C., on "The U. S. Antidumping Law: After the Trade Reform Act," in *Annual Report of the Secretary of the Treasury on the State of the Finances for the fiscal Year Ended June 30, 1975* at 358.

As stated in *Investment Company Institute v. Camp, Comptroller of the Currency*, 401 U.S. 617, 628, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971):

> "Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands."

■ In passing upon an ITC final determination, this court cannot, and should not, attempt to act as a "superagency" adjudicating *de novo* the controversy which Congress has assigned to the ITC for determination. The court, however, can and should require the ITC to perform its assigned responsibility as directed by the applicable statutory provisions.

■ Congress has not only directed the ITC to *state* its determinations but has also required the agency to *explain* those determinations. The statutory requirements of "a statement of reasons," imposed by the 1958 amendments to the Antidumping Act, and the "complete statement of findings and conclusions" imposed by the Trade Act of 1974, are clearly consistent with applicable decisional law. For the ITC these requirements are specifically mandated by the pertinent statutory provisions.

The ITC determination in this case nominally includes the majority's "Statement of Reasons." In substance, however, the statements are really mixed conclusions of ultimate facts and statutory interpretation, rather than reasons. The ITC has stated the conclusions which presumably are the result of its reasoning, but it has neither supplied nor articulated the reasons which support those conclusions.

An illustration is the conclusion that significant market penetration alone is not an adequate basis for determining injury. This is a major policy determination with broad and significant implications in the interpretation and administration of the an-

tidumping law. Clearly, Congress intended the ITC to develop and refine the very general concept of injury as it is applied to individual cases. This responsibility is not adequately discharged in a case in which the ITC determination is neither clearer nor more specific than the statutory language itself.

When the ITC fails to delineate and make explicit the basis for its conclusions, by articulating a rational connection between the facts found and the discretionary action taken, the court cannot decide, as it must, whether the ITC has exercised a reasoned discretion consistent with legislative intent.

In order for the court to perform its function of judicial review, this proceeding is stayed, and the ITC will be afforded an additional opportunity to supply this court with the reasons supporting its conclusions. See *United States v. Bianchi & Co.*, 373 U.S. 709, 718, 83 S.Ct. 1409, 1415, 10 L.Ed.2d 652 (1963). Cf. *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

Accordingly, it is Ordered that this proceeding be stayed for such necessary time, not to exceed 90 days, as the ITC may require to supply the court with a more specific and explicit statement of reasons for the conclusions that: (1) the affected "industry" was limited to, alternatively, the facilities devoted to the production of all portable typewriters, or, the production of portable electric typewriters; and, (2) significant market penetration by less than fair value imports alone is not an adequate basis for determining injury.