**SCM CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant;**

**Brother International Corporation, Party-in-Interest.**

**Court No. 77–4–00553.**

United States Court of International Trade.

July 15, 1982.

---

Frederick L. Ikenson, Washington, D. C., for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C. (David M. Cohen, Director, Commercial Litigation Branch, and Sheila N. Ziff, New York City), for defendant.

Tanaka Walders & Ritger, Washington, D. C. (H. William Tanaka and Wesley K. Caine, Washington, D. C., of counsel), for party-in-interest.

### MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGEMENT

NEWMAN, Judge:

## I.

### BACKGROUND

This action, brought under 19 U.S.C. § 1516(c) (1976) by SCM Corporation (SCM), a domestic portable typewriter manufacturer, is again before the Court following my remand to, and the responsive Statement of Reasons by, the United States International Trade Commission ("Commission") in *Portable Electric Typewriters From Japan*, U.S.I.T.C. Public 732, Investigation No. AA1921–145 (40 FR 27079 (1975)). Plaintiff has contested the Commission's negative determination of injury made on June 19, 1975 under the Antidumping Act of 1921, as amended (19 U.S.C. § 160 *et seq.*) [1], and now before the Court is the Commission's new Statement of Reasons dated September 23, 1981. The history of this protracted case is summarized in my prior decision of July 1, 1981 remanding the action to the Commission,[2] and that background will be reiterated here only to the extent necessary for discussion of the remaining issues raised by the parties.

Briefly, my order of July 1, 1981 stayed the proceedings and specified that the Com-

---

1. The Commission determined, by a vote of three to two with one abstention, that an industry in the United States is not being or likely to be injured or prevented from being established by reason of portable electric typewriters from Japan sold at less than fair value within the meaning of the Antidumping Act, as amended. Chairman Leonard and Commissioners Bedell and Parker determined in the negative, while Commissioners Moore and Ablondi determined in the affirmative. Vice-Chairman Minchew abstained from voting. Chairman Alberger, Vice-Chairman Calhoun, and Commissioners Bedell and Stern provided the statement on remand. Thus, of the three Commissioners composing the majority voting negatively, only Bedell remained on the Commission and participated in the proceedings on remand.

2. 2 CIT ——, Slip Op. 81–57, 519 F.Supp. 911 (1981).

mission: (a) supply this Court with a more specific and explicit Statement of Reasons in compliance with the prior remand order entered by Chief Judge Re on March 7, 1980 [3] (with which order the Commission had not complied); (b) reconsider and advise this Court whether there was price suppression; and (c) make and report a specific finding of fact as to whether there were lost sales as a consequence of market penetration by the Japanese less than fair value (LTFV) imports.

On October 1, 1981 defendant filed with the Court the "Statement of the U. S. International Trade Commission in Compliance with Remand Order", dated September 23, 1981. This statement was approved and signed by all of the members of the Commission. In its statement of September 23, 1981 the Commission explained: (1) why it concluded that the facilities of SCM for producing manual typewriters could not be considered as a separate industry for purposes of the injury investigation; (2) why it would not predicate an affirmative determination of injury on significant market penetration standing alone; (3) why it could not find price suppression; and (4) why the record fails to support a finding of significant lost sales by reason of the LTFV imports.

In short, on remand the Commission has reexamined the record before it and provided this Court with a new Statement of Reasons. The central issue is whether the Commission's negative injury determination is correct in light of the reasons advanced in its initial and new Statement of Reasons and the record before the Commission. Presently before the Court are plaintiff's renewed motion for summary judgment and the renewed cross-motions for summary judgment by defendant and the party-in-interest. For the reasons expressed herein, plaintiff's renewed motion is denied, and the renewed cross-motions by defendant and the party-in-interest are granted. Accordingly, the Commission's negative injury determination is affirmed.

## II.

## OPINION

### A.

### *Commission's Compliance With Remand Order*

■ Initially, plaintiff contends that the Commission's statement of September 23, 1981 fails to comply with either the "letter or the spirit" of the second remand order (dated July 1, 1981), and that the Commission's statement is logically and factually unsupportable. Specifically, plaintiff argues that the Commission's new statement constitutes merely *"post hoc* rationalizations" of the Commission's initial determination, and manifests an "institutional commitment" to defend the original determination rather than a genuine reconsideration of the issues. These contentions must be rejected.

The remand orders required more specific and explicit explanations for certain conclusions reached by the Commission in its original Statement of Reasons. In their new statement, the Commissioners advised that they had "carefully reviewed the [administrative] record" when they acted in compliance with the remand order; and plainly, the Commission's response manifests an objective and good faith effort to merely articulate the reasoning behind the conclusions previously reached by the Commission and questioned by the Court. Except to the extent that my remand order required the Commission to make additional findings of fact, the Commission was required to do nothing more than elaborate on certain conclusions previously reached in its original Statement of Reasons. Clearly, the Commission's new statement did not recast any of the reasons articulated in its original statement, and the orders of remand did not oblige the Commission to arrive at a different substantive result. Cf. *Sprague Electric Company v. United States (Capar Components Corp., Party-in-Interest),* 84 Cust.Ct. 243, C.R.D. 80–3, 488 F.Supp. 910

**3.** See 84 Cust.Ct. 227, C.R.D. 80–2, 487 F.Supp. 96 (1980).

(1980), in which the action was remanded to the Commission expressly for reconsideration and a new determination by the Commissioners serving at that time. See also the remand to the Secretary of Labor for administrative reconsideration in *R. E. Abbott et al. v. United States Secretary of Labor*, 2 CIT ——, Slip Op. 82–12 (February 11, 1982).

In sum, plaintiff's contentions that the Commission has failed to comply with the Court's remand orders and that the Commission's new statement comprises *post hoc* rationalizations are without merit. However, the question remains whether, in light of the Commission's original Statement of Reasons and its new findings of fact and clarifications, the negative injury determination should be sustained.

■ It is now settled law that the sole standard of review of factual determinations of injury or likelihood of injury in antidumping cases is whether the Commission's determination is supported by substantial evidence. *Armstrong Bros. Tool Co., et al. v. United States*, 67 CCPA 94, C.A.D. 1252, 626 F.2d 168 (1980). Moreover, in reviewing an injury determination under the Antidumping Act, the Court may not weigh the evidence concerning specific factual findings, nor may the Court substitute its judgment for that of the Commission. *Sprague Electric Company v. United States (Capar Components Corp., Party-in-Interest)*, 1 CIT ——, Slip Op. 81–120, 529 F.Supp. 676 (1981), and cases cited.

### B.

### *Scope of the Affected Domestic "Industry"*

■ We turn to the issue of industry scope. The Commission's statement on remand aptly points out that in any determination of injury under the Antidumping Act a necessary first step is to define the scope of the domestic industry against which the impact of LTFV imports is to be measured. In its original Statement of Reasons, the Commission majority stated in pertinent part:

In this case the imported articles found to be sold at LTFV by the Treasury and the imported articles covered by the Commission's notice of investigation are portable electric typewriters. However, with regard to what is the industry most likely to be affected by the subject imported articles, we have considered whether that industry is, in the alternative, the facilities devoted to the production of all portable typewriters (both electric and manual) or the facilities devoted to the production of only portable electric typewriters. In either instance the industry is the U. S. facilities of SCM Corporation, the sole U. S. producer of portable electric and portable manual typewriters.

Plaintiff argued in support of its original motion for summary judgment that the Commission erred as a matter of law when it failed to consider a third alternative industry—the domestic production facilities for portable manual typewriters. The Court's remand orders required the Commission to supply a more specific and explicit Statement of Reasons for its conclusion relating to the scope of the affected domestic industry.

In the new statement on remand, the Commission submitted its reasons for the original approach taken to the question of industry scope. To summarize, the Commission explained:

1. That portable electric typewriters, as distinct from portable manual typewriters, were the subject of the less-than-fair-value determination;

2. That "[t]he domestic industry producing articles of a like class or kind [portable electric typewriters] competes most directly with and is most likely to be affected by LTFV imports"; SCM is the sole U. S. producer of portable electric typewriters, and therefore, "[t]he core consideration * * * is the effect of the imports on SCM's facilities devoted to the production of portable electric typewriters";

3. That SCM also manufactures portable manual typewriters, and the record indicates that LTFV imports of low-end

portable electric typewriters may compete with manual portables produced by SCM and may affect their sales. Consequently, it was appropriate for the Commission to alternatively consider SCM's entire facilities for the production of portable typewriters, both manual and electric, in assessing injury;

4. That the information of record indicates SCM enjoyed a "dominant position in the U. S. market for portable typewriters", and SCM's production facilities were of such a nature that SCM could change the mix of its products (i.e., the mix of portable electrics and portable manuals) in response to changing market trends and consumer preferences; and

5. That while "the inter-relationship of facilities devoted to the production of both kinds of portables may justify extension of the Commission's examination to include the production of manuals in addition to electrics, it in no way suggests viewing the facilities producing manuals as a separate industry", for purposes of the proceeding at hand. Significantly too, the Commission additionally noted:

Moreover, imports of portable manual typewriters, which were neither alleged nor found to have been sold at LTFV, averaged 1,451,000 units per year during 1971–74 and accounted for about 91.5 percent of apparent U. S. consumption of these articles * * *. Thus, if the segment of SCM's business producing portable manual typewriters suffered injury, the injury was probably attributable to its inability to compete with fair value imports of manual units and not to LTFV imports of portable electric typewriters from Japan.

The Commission's new statement on remand adequately articulates its reasons for the alternative industry approach employed in the original Statement of Reasons, and for not trifurcating the domestic industry in the manner advanced by plaintiff.[4] I find these reasons to be rational and its findings supported by substantial evidence. Further, it is to be noted that prior to the enactment of the Trade Agreements Act of 1979, the Commission had broad discretion in delineating the relevant domestic industry against which it was required to assess the effects of LTFV imports inasmuch as the term "industry" was not defined in the Antidumping Act of 1921. The Commission's approach to industry scope in this case was well within its broad discretion.

## C.

### Market Penetration by LTFV Imports

In its original Statement of Reasons, the Commission majority acknowledged that the LTFV imports from Japan had obtained a significant share of the domestic market for portable typewriters during the period of the Treasury investigation (October 1973 —March 1974), but posited that "[i]mport penetration alone is not an adequate basis for determining injury". The Commission majority explained that none of the other tests of injury applied in this case showed injury to the domestic injury, but to the contrary such tests indicated that the domestic industry (viz, SCM) had prospered and was likely to continue expanding.

In its new statement, the Commission has, at the direction of the Court, further elaborated upon its view that market penetration alone is an insufficient basis for an affirmative finding of injury.

The Commission's new statement on remand cites the facts that the affected domestic industry in this case is represented by a single large firm (SCM) that has no

---

**4.** Chief Judge Re rejected a similar explanation by *Government counsel* as being "at best, a *post hoc* rationalization". See 84 Cust.Ct. at 242, 488 F.Supp. 910. It is a fundamental principle of administrative law that the *post hoc* rationalizations of Government counsel may not be relied upon to uphold agency action. *Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–246, 9 L.Ed.2d 207 (1962). However, Chief Judge Re's previous *rejection* of the *post hoc* rationalizations by Government counsel has no application to the similar explanation in the Commission's remand statement since that explanation was provided in compliance with this Court's orders requiring a more specific statement of reasons.

domestic competitors and holds a dominant position in the United States market; that during the period covered by the investigation (1971–74) SCM showed improved performance in all indices of the health of the industry; and that the Commission's view respecting market penetration is consistent with prior Commission precedent. Further, the Commission observed:

> In view of the expanding and increasingly profitable business of the single domestic producer, the mere fact of significant import penetration is not by itself capable of demonstrating injury. This is even more the case since the data show that import penetration dropped sharply in the last year for which information was collected.

And apparently recognizing that the market penetration issue posed by the Court's remand raises essentially a question of law, the Commission stated:

> If increasing penetration alone were adequate to show injury, such a conclusion could be reached by a computer, negating the need for the conceived scheme of economic analysis, and *weighing of all factors* such as production, shipments, capacity utilization, employment and profitability by a collegial body of human beings. [Emphasis added.]

 I fully agree with the Commission's rejection of what in essence amounts to a *per se* injury rule based upon significant market penetration.[5] In *Armstrong Bros. Tool Co., et al. v. United States (Daido Corporation, Steelcraft Tools Division, Party-in-Interest)*, 84 Cust.Ct. 16, C.D. 4838, 483 F.Supp. 312, aff'd., 67 CCPA 94, C.A.D. 1252, 626 F.2d 168 (1980), this Court emphasized the complex multifaceted economic and financial analysis involved in making an injury determination under the Antidumping Act and the broad discretionary authority vested in the Commission. Hence, although significant market pene-

tration by the LTFV imports is obviously a highly relevant factor, the Commission has the discretion—indeed an obligation—to consider and weigh a number of other pertinent economic and financial criteria, and consider all the facts and circumstances, including the health of the domestic industry. That approach is precisely what the Commission followed in this case, eschewing any *per se* injury rule predicated upon significant market penetration.

In view of *Armstrong*, there is now a judicially approved explanation as to the reason why no single economic or financial factor necessarily constitutes injury within the contemplation of the Antidumping Act. Therefore, quite apart from the Commission's rationale expressed in its new Statement of Reasons, the question of law raised on remand pertaining to significant market penetration has been judicially answered in agreement with rationale applied by the Commission.

Plaintiff's arguments are directed essentially at the relative weight and significance the majority Commissioners accorded to the various factors considered (including market penetration), and also directed at the weight of the evidence. But fundamentally, the relative weight the Commission chose to accord market penetration *vis a vis* other equally pertinent injury criteria considered was a matter of discretion and expert judgment; and as we have seen, it is not the function of the Court in reviewing an injury determination of the Commission under the Antidumping Act to weigh the evidence or to substitute its judgment for that of the Commission. *Armstrong, supra.* Here, the Commission in making its injury determination acted well within its discretion in giving more weight to the various indices of the health of the domestic industry (supported by substantial evidence) than to the factor of significant market penetration, which market penetration the Commis-

---

**5.** Plaintiff maintains that it does not advance a *per se* injury rule based on significant market penetration. Rather, plaintiff argues that when there is significant market penetration due to underselling the domestic product, "it must be inferred that the domestic industry lost sales and was thereby injured by reason of such imports" (Brief, at 12). As discussed *infra*, the Commission on remand found no substantial evidence of lost sales, but on the contrary, found that SCM's sales had increased during the period of the investigation.

sion noted had dropped precipitously in the last year for which information was collected.[6]

### D.

### *Price Suppression*

■ The Commission's original statement found the evidence of record insufficient to establish price suppression. Plaintiff argued in its original motion for summary judgment that in determining the existence of price suppression, the Commission should have made a comparison between the wholesale price index for portable typewriters and that for office typewriters, rather than between the index for portable typewriters and that for office and store machines and equipment. In the remand order of July 1, 1981 the Commission was directed "to reconsider and advise this Court whether there was price suppression, after comparing the wholesale price indexes for portable typewriters and office (electric) typewriters; or to supply this Court with specific reasons why such basis for comparison is inappropriate".

The Commission, in its new statement, has "upon reevaluation of the record" again found no substantial evidence of price suppression as a result of the LTFV imports of portable electric typewriters. Indeed, on remand the Commission, after comparing the respective wholesale price indexes for portable typewriters and office electric typewriters (the comparison ordered by this Court), found:

> * * * prices for both types of typewriters increased at a similar pace throughout the 1971–1974 period. This information strongly tends to show no suppression of prices by reason of LTFV imports.

In the course of reconsidering its prior finding relative to the absence of price sup-

pression, as required by this Court, the Commission carefully considered and discussed in its new statement the problem of using certain base years for making a realistic wholesale price-index comparison between office typewriters and portable typewriters. Given all the facts and circumstances taken into account by the Commission, I find the Commission's approach to be rational and supported by substantial evidence. Plaintiff's discussion in its brief of statistical methodology suggesting the rebasing of indexes and assertion of certain facts to challenge the Commission's findings are unsupported by the record.

### E.

### *Lost Sales*

■ The majority's original Statement of Reasons made no explicit finding of lost sales.[7] However, the dissenting Commissioners apparently reasoned that lost sales were implicit or inferable from SCM's loss of a significant share of the market.[8] However, no evidence of record respecting lost sales is referred to by the dissenters.

My order of remand directed the Commission to "make and report to this Court a specific finding of fact respecting whether there were lost sales as a consequence of market penetration by the Japanese LTFV imports". Responding, the Commission's new statement concluded that "[n]o information in the record of this case offers substantial evidence that the domestic industry lost a significant number of sales, or was injured thereby, as a result of imports of portable electric typewriters from Japan".

Plaintiff maintains that the Commission's new statement is not responsive to the Court's directive. This contention is plainly

---

**6.** The Commission found that the percentage of the market achieved by the imports was about 21% in 1971, 29% in 1972, 37% in 1973 and dropped to 26% in 1974.

**7.** As previously noted by this Court in 2 CIT ——, Slip Op. 81–57: "Chairman Leonard considered 'that import penetration indicates injury only when it is established that the penetra-

tion is at the expense of the domestic industry *and causes lost sales*' (40 FR 27080, fn. 2) (Emphasis added). Implicitly, therefore, Chairman Leonard found there were no lost sales."

**8.** The dissenting Commissioners found that SCM "has clearly lost a considerable share of the market and *consequently* lost considerable sales" (40 FR 27081) (emphasis added).

untenable. In point of fact, the Commission set forth in detail the basis for its conclusion and specifically addressed plaintiff's contentions.

Thus, the Commission rejected the argument that the increased market share obtained by the Japanese imports must necessarily have been achieved at the expense of the domestic industry in the form of lost sales. The information before the Commission showed that while the percentage of the market attained by the Japanese imports increased during the period of 1971–74, *the market share* in that period for *all imports* dropped, and consequently, *SCM's own sales increased substantially, both relatively to imports and in absolute terms.* Moreover, the Commission points up that the introduction of lower-priced models from Japan—

> * * * created a vastly increased market for portable typewriters by stimulating demand. As a result, only at most a small portion of the sales of Japanese imports represented a loss to SCM; instead, many represent sales that likely would never have been made in the absence of the low-end models from the market.

The Commission further considered plaintiff's contention that SCM lost specific sales to customers in the mass-merchandising area. On that score, the Commission found the information presented by SCM was "largely speculative and * * * rebutted in part by other information in the record." Specifically, the Commission rejected SCM's claimed losses to three accounts predicated, not on an actual decline in sales, "but on a projection of the amount of sales that SCM might have made in the absence of LTFV imports". In that connection, the Commission observed:

> SCM compares its actual average sales per store for three accounts in 1970 with its sales per store in 1974, measuring its claimed loss by the difference between the actual 1970 sales and the sales SCM would have made if it had maintained its 1970 ratio of sales per store.
>
> The assumption that each new store added by the three mass merchandisers

handled as many portable typewriters as each store did in 1970 is disputed by other testimony in the record. It was pointed out that new stores opened by K-Mart in 1973 and 1974 were smaller than prior stores and devoted less display space to typewriters. In addition, one of the three mass merchandisers, in a confidential submission, informed the Commission that SCM's sales to it steadily increased between 1971 and 1973, and that it only began purchasing directly from the Japanese respondents in 1974. It also stated that if its purchases of LTFV imports had any effect on its business with SCM, it was because of (1) SCM's inability to provide it with the beginning price point models that were purchased prior to 1974 from Royal, and (2) SCM's failure to provide it with the full quantity of SCM's innovative cartridge ribbon typewriters that it could have sold. Finally, Table 16 is based on the underlying assumption that there was a one-to-one relationship between sales of Japanese imports and sales lost by SCM, an assumption that, as discussed above, is untenable. *Thus, there is no creditable evidence of record demonstrating significant lost sales by the domestic industry by reason of LTFV imports.* [Footnotes omitted.] [Emphasis added.]

I agree with the Commission's determination that there is no basis in the record for finding that SCM lost significant sales by reason of the LTFV imports. To overturn the Commission's conclusion on this aspect of the case would require the Court to engage in speculative second guessing, and judging the credibility and weight of certain evidentiary matters in the administrative record, which would usurp the Commission's discretion.

### F.

#### Conclusion

In summary, I find that on remand the Commission made a thorough examination of the record and rendered a good faith and legally adequate response to the Court's remand orders. Plaintiff's attack upon the good faith of the Commissioners is unsupported by the record.

This Court may disturb the Commission's determination only if it lacks any rational or statutory foundation or is unsupported by substantial evidence. From the Commission's new statement on remand, it is clear that in arriving at its negative determination the Commission considered appropriate economic and financial factors; and in a word, my examination of the administrative record reveals substantial evidence supporting the factual findings of the Commission.

Accordingly, for all the foregoing reasons the negative determination of the Commission is affirmed.[9] It is ordered that defendant's and party-in-interest's renewed cross-motions for summary judgment are granted; and plaintiff's renewed motion for summary judgment is denied.

---

**9.** As noted in my previous memorandum and order (Slip Op. 81–57), the Commission made an affirmative determination of injury on May 7, 1980 pursuant to plaintiff's petition filed on April 9, 1979 for the initiation of a second antidumping proceeding covering portable electric typewriters from Japan containing updated information. *Portable Electric Typewriters From Japan*, U.S.I.T.C. Public 1062, Investigation No. 731–TA–12, 45 FR 30186 (1980). On May 9, 1980 the Secretary of Commerce published an antidumping order. 45 FR 30618 (1980). When the Commission announced its affirmative determination, Commissioner Bedell, then the only member of the majority in the initial investigation remaining with the Commission, distinguished the negative determination in the initial investigation. Briefly, Chairman Bedell found that the economic conditions affecting the domestic industry under the initial investigation were quite different from those considered in the second investigation, and that the data showed that the earlier favorable trends had reversed. 45 FR 30188 (1980). Of course, in reviewing the Commission's negative determination in the first investigation, the Court could not—and thus did not—consider the new record before the Commission in the second investigation, which lead to an affirmative determination.