**SPRAGUE ELECTRIC COMPANY,**
**Plaintiff,**

v.

**UNITED STATES (Capar Components Corp., Party-In-Interest), Defendant.**

**C.R.D. 80–3; Court No. 77–9–03056.**

United States Customs Court.

March 27, 1980.

Frederick L. Ikenson, Washington, D. C., for plaintiff.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Director, Commercial Litigation Branch, Joseph I.

Liebman, Attorney in Charge, Customs Litigation, and Sidney N. Weiss, Trial Atty., New York City, for defendant.

NEWMAN, Judge:

## INTRODUCTION

Plaintiff, an American manufacturer of tantalum electrolytic fixed capacitors, challenges the negative injury determination of the United States International Trade Commission ("Commission") in Investigation No. AA1921–159 (41 FR 47604 (1976)), under the Antidumping Act of 1921, as amended (19 U.S.C. § 160 *et seq.* (1970)). That investigation involved tantalum electrolytic fixed capacitors imported from Japan which the Department of the Treasury ("Treasury") had determined were being or were likely to be sold in the United States at less than fair value ("LTFV") within the meaning of the Antidumping Act, as amended. This suit has been brought under the provisions of 28 U.S.C. § 1582(b) (1976), 28 U.S.C. § 2632(a) (1976) and 19 U.S.C. § 1516(c) (1976).

Capar Components Corp., the party in interest, is the consignee in New York seaport consumption entry No. K 429821–77 of August 5, 1977 who imported tantalum electrolytic fixed capacitors from Japan without assessment of antidumping duties, and who has been made a party pursuant to 19 U.S.C. § 1516(c) (1976). Under 19 U.S.C. § 1516(f) (1976), the consignee or his agent has the right to appear and be heard as a party in interest in an action brought by an American manufacturer pursuant to section 1516. However, Capar Components Corp. has not participated in the defense of this case.

Presently before the Court are plaintiff's motion and the Government's cross-motion for summary judgment. For the reasons that follow, proceedings in this action shall be stayed pending reconsideration by the Commission of its negative determination in Investigation No. AA1921–159.

## BACKGROUND

The pertinent facts concerning the administrative proceedings leading to the initiation of this action are undisputed, and may be summarized chronologically:

1. On September 24, 1975 plaintiff, through counsel, submitted a complaint to the Commissioner of Customs alleging that tantalum electrolytic fixed capacitors from Japan were being sold at LTFV within the meaning of the Antidumping Act of 1921, as amended.

2. On October 17, 1975 Treasury issued a notice that an investigation had been instituted to determine whether tantalum electrolytic fixed capacitors from Japan were being or were likely to be sold at LTFV (40 FR 48702).

3. On April 23, 1976 a Withholding of Appraisement Notice covering tantalum electrolytic fixed capacitors from Japan issued by Treasury was published in the *Federal Register* (41 FR 16983).

4. On July 27, 1976 an affirmative Determination of Sales at LTFV covering tantalum electrolytic fixed capacitors from Japan (other than those produced and sold by Matsushita Electric Industrial Co., Ltd.) was issued by Treasury and published in the *Federal Register* (41 FR 31240).

5. On August 3, 1976 the Commission instituted Investigation No. AA1921–159 to determine whether an industry in the United States was being or was likely to be injured, or prevented from being established, by reason of the importation of tantalum electrolytic fixed capacitors from Japan at LTFV. Notice of the institution of the investigation and of the public hearing was published in the *Federal Register* on August 9, 1976 (41 FR 33337).

6. On October 22, 1976 the Commission, by a vote of 5 to 1, reached a negative determination, viz., the Commission majority determined that an industry in the United States was not being and was not likely to be injured, or prevented from being established by reason of the imports at LTFV. The decision, together with a Statement of Reasons, was published in the *Federal Reg-*

*ister* on October 29, 1976 (41 FR 47604). The Commission stated that in arriving at its determination, it "gave due consideration to written submissions from interested parties, evidence adduced at the hearing, and all factual information obtained by the Commission's staff from questionnaires, personal interviews and other sources" (*id*).

7. During the Commission's investigation, counsel for plaintiff informed the Commission at the hearing held on September 8, 1976 of the likelihood that the import statistics for tantalum electrolytic fixed capacitors from Japan were inaccurate and underrepresented the true volume of such imports. Document No. 52 at 30–31, hearing transcript (PUBLIC).

8. On June 13, 1977, after the Commission announced its negative determination in this case, the Commission was informed by its Director of Industries that the investigation was "yet another example of substantially erroneous official import statistics being used by the Commission and its staff during the course of public investigations". The Foreign Trade Division of the Bureau of the Census conducted an investigation of the accuracy of import statistics for tantalum electrolytic fixed capacitors from Japan by calendar quarters for 1975 through mid-1977. The investigation showed that for 1975 the actual volume of such imports was 21,814,079 units, whereas the erroneously reported volume of such imports during 1975, upon which the Commission relied, was 14,948,243 units. This translates into an increase in market penetration from 4.6 percent to 6.6 percent. Further, the investigation showed that for the first half of 1976 the actual volume of such imports was 19,328,083 units, whereas the erroneously reported volume of such imports during this period upon which the Commission relied was 13,769,411 units.

9. On July 21, 1978 the Commission's General Counsel raised with the Commission the possibility of reconsidering its determination in light of the erroneous import statistics relied upon by the Commission and its staff.

10. On August 22, 1978 the Commission published in the *Federal Register* notice of the erroneous import statistics and invited the public to comment upon "whether the Commission's reliance on erroneous official statistics justifies further Commission action with respect to its determination in Investigation No. AA1921–159" (43 FR 37233).

11. On February 9, 1979 the Commission published notice in the *Federal Register* that no further action would be taken with respect to its negative determination in Investigation No. AA1921–159 (44 FR 8359). No reason was given by the Commission for not taking further action.

No question is presented concerning plaintiff's compliance with the administrative prerequisites to the initiation of a civil action prescribed by 19 U.S.C. § 1516(a) and (c).

During the discovery phase of this litigation, plaintiff sought, *inter alia*, production of "All documents and things in the files of the International Trade Commission and/or individual Commissioners, pertaining to the Commission Investigation No. AA1921–159 * * * ". Defendant moved for a protective order prohibiting plaintiff from conducting discovery into matters beyond the Commission's notice of investigation and hearing (41 FR 33337–38 (1976)) and the Commission's negative injury determination and Statement of Reasons (41 FR 47604–07 (1976)). Defendant's motion was decided by this Court on June 27, 1978 culminating in an order which, in pertinent part, reads (80 Cust.Ct. 256, 257, C.R.D. 78–7 (1978)):

2. That the Secretary of the United States International Trade Commission, Kenneth R. Mason, shall prepare and transmit to Joseph E. Lombardi, Clerk of the United States Customs Court, on or before July 28, 1978, the following: (1) a certified copy of the transcript of proceedings and exhibits introduced before the Commission in investigation AA1921–159; (2) certified copies of all written submissions, questionnaires, reports and all other documents relating to investigation AA1921–159; and (3) all other things

in the files of the Commission relating to the investigation. *Cf.* Judge Maletz' order in *Pasco Terminals, Inc. v. United States*, 80 Cust.Ct. 249, C.R.D. 78–3 (1978), and also his unpublished order in the same case entered on May 8, 1978. See also my order in *Armstrong Bros. Tool Co. et al. v. United States (Daido Corporation, Steelcraft Tools Division, Party-in-Interest)*, 80 Cust.Ct. 252, C.R.D. 78–5 (1978), entered concurrently herewith.

3. That denial of defendant's present motion for a protective order shall be without prejudice to renewal respecting any documents or things that were received by the Commission on a confidential basis or are otherwise privileged.

4. That the basis of this order is to enable the court to determine whether or not the Commission's finding of injury was, among other things, arbitrary, an abuse of discretion, or otherwise contrary to law. See, e. g., *Camp v. Pitts*, 411 U.S. 138 [93 S.Ct. 1241, 36 L.Ed.2d 106] (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 [91 S.Ct. 814, 28 L.Ed.2d 136] (1971); *Imbert Imports, Inc. v. United States*, 60 CCPA 123, C.A.D. 1094, 475 F.2d 1189 (1973); *Suwannee Steamship Company v. United States*, 79 Cust.Ct. 19, C.D. 4708, 435 F.Supp. 389 (1977); *Cf. Dunlop v. Bachowski*, 421 U.S. 560 [95 S.Ct. 1851, 44 L.Ed.2d 377] (1975). See also questions and answers attached to the letter of Daniel Minchew, Chairman, United States International Trade Commission, November 16, 1977, reproduced in *Hearing before the Subcommittee on Trade, House Committee on Ways and Means, on the Adequacy and the Administration of the Antidumping Act of 1921* (95th Cong., 1st Sess. 1977) pp. 65–66.

Pursuant to the foregoing order, as modified, the Secretary of the Commission transmitted what are represented to be all of the documents and things enumerated and described above that were locatable, with the exception of seven documents that were claimed by the Commission Chairman to be privileged.[1]

### PARTIES' CONTENTIONS

Plaintiff contends that the Commission reached a negative injury determination by misinterpreting and misapplying the law. Specifically, plaintiff urges that the Commission "impermissibly fragmented the relevant product group of LTFV imports and considered the impact of such subgroups rather than the impact of the total group" (memorandum at 15). Further, plaintiff maintains that even if the Commission did not misapply the law, "the findings of fact upon which the Commission based its negative determination are arbitrary and capricious, and not supported by substantial evidence" (*id*). Finally, plaintiff seeks to overturn the Commission's determination on the basis that "it has been admitted by the Commission that the import statistics it relied upon were false and underrepresented the true magnitude of LTFV imports" (*id*). Hence, plaintiff seeks an order setting aside the Commission's determination and directing Treasury to publish a finding of dumping, with the result that dumping duties will be assessed, where appropriate, on entries of the subject capacitors from Japan.

1. The order of June 27, 1978 was modified by a protective order entered on August 1, 1978, and was further modified in an order entered on December 27, 1978, wherein a claim of privilege was sustained respecting seven documents. 81 Cust.Ct. 168, C.R.D. 78–18, 462 F.Supp. 966 (1978). In an order entered on January 25, 1979, a claim of privilege was denied as to a portion of one other document, which was made available to plaintiff's counsel in its entirety. 82 Cust.Ct. 304, C.R.D. 79-4 (1979).

The documents and things comprising the administrative record are listed on two numbered indexes, which were also transmitted to the Court, entitled "List No. 1 Public Documents Transmitted to the United States Customs Court", and "List No. 2 Confidential Documents Transmitted to the United States Customs Court". Public documents are identified on List No. 1, while those documents which the Commission treated as containing confidential business information and which are subject to the terms of the protective order entered on August 1, 1978, are identified on List No. 2.

Defendant advances the argument that the Court is limited to a review of the Commission's Statement of Reasons in deciding whether the Commission's determination is arbitrary, capricious or otherwise contrary to law. Relying upon the foregoing scope and standard of review, defendant urges that in its Statement of Reasons, the Commission (majority) applied proper legal criteria and considered appropriate indicia of injury, and therefore its determination is not arbitrary, capricious or otherwise contrary to law. Moreover, defendant contends that the Commission's determination is supported by the administrative record. Finally, defendant posits that the Commission properly limited its investigation to the impact on the domestic industry of the LTFV imports; and that the erroneous import statistics relied on by the Commission had no material bearing on the Commission's negative determination.

## OPINION

### I

The scope and standard of review pertaining to the Commission's injury determinations under the Antidumping Act were addressed in my recent opinions in *Armstrong Bros. Tool Co. et al. v. United States (Daido Corporation, Steelcraft Tools Division, Party-in-Interest)*, 84 Cust.Ct. ——, C.D. 4838 (1980), *appeal pending*, and *Armstrong Bros. Tool Co. et al. v. United States (Great Neck Saw Manufacturing, Incorporated, Party-in-Interest)*, 84 Cust.Ct. ——, C.D. 4848 (1980). That discussion is fully applicable in the present case. To briefly reiterate, the Court of Customs and Patent Appeals has stressed that "[t]he courts have a very limited power of review over the Commission's [injury] determinations"; and, "[i]t is not the judicial function to review or to weigh the evidence before the Commission or to question the correctness of findings drawn therefrom". *City Lumber Co. et al. v. United States*, 59 CCPA 89, 92, C.A.D. 1045, 457 F.2d 991 (1972). See also *Imbert Imports, Inc., et al. v. United States*, 60 CCPA 123, C.A.D. 1094, 475 F.2d 1189 (1973); *Kleberg & Co. (Inc.) v. United States*, 21 CCPA 110, T.D. 46446 (1933). The foregoing decisions and other cases cited and discussed in the first *Armstrong* opinion teach that this Court may not substitute its judgment in factual matters for that of the Commission, and the relative weight to be given to the various criteria of injury considered by the Commission is a matter for that agency's discretion and expert judgment.

■ Additionally, in the first *Armstrong* case, I emphasized the complex nature of an injury determination under the Antidumping Act, and the intent of Congress to provide the Commission with a wide latitude within which to make its determination on a case by case basis. But there is no dispute that the Commission's determination may be set aside if arbitrary, capricious or otherwise contrary to law, as held in the *Armstrong* cases.

### II

Here, the Statement of Reasons by the Commission (majority) discussed five criteria of injury (market penetration of LTFV sales, U.S. shipments, lost sales, profits, and prices) and found that any injury which the domestic industry may have experienced, or may be likely to experience, "is not by reason of LTFV imports" (41 FR 47605). Accordingly, the Commission determined that since the condition of causation imposed by the statute was not satisfied, a negative determination was required.

The Commission, in its discussion of market penetration of LTFV sales, stated (41 FR 47605):

[I]n determining the impact of LTFV sales of tantalum capacitors from Japan on the relevant U.S. industry, we have excluded from consideration imports of tantalum capacitors of Matsushita Electric Industrial Co., Ltd., as Treasury has done from its LTFV determination, and have considered the impact of 35 percent of the remaining tantalum capacitor imports from Japan, since this is the percentage which Treasury actually found to be sold at LTFV after looking at about 75

percent of such imports during the period of investigation. References to import statistics and import penetration in this statement reflect this finding.

The Commission then observed that the penetration of LTFV imports of tantalum capacitors from Japan declined from about 2 percent for 1974 to less than 1.5 percent for 1975.

Continuing, the Commission noted the decline in U.S. producers' shipments of tantalum capacitors and found:

> This 32-percent decline in U.S. producers' shipments in that year [1975] was attributable to the recession and not to LTFV imports, which not only declined by 50 percent in absolute quantity but also experienced a market decline in their already minimal market share in 1975, as noted above.

Lost sales by the domestic industry were not attributable to the LTFV imports according to the Commission:

> *Lost Sales*—A thorough examination of transactions in the original equipment manufacturers (OEM) market in the United States in 1975, covering 67 percent of the value of Japanese imports in that year, reveals that a Japanese-made tantalum capacitor was priced below an American-made capacitor in 25 percent of the instances in which they met in the OEM market. In two-thirds of those instances, however, the Japanese-made capacitor was not purchased.
>
> Although one Japanese supplier of LTFV imports consistently undersold U.S. producers with respect to one type of capacitor sold to one particular OEM account, the quantity of its U.S. sales of this capacitor was so small that it could not be an identifiable cause of adverse impact on the domestic industry.

Although profits of the domestic industry on their tantalum capacitor operations declined significantly from 1973 to 1975, the Commission majority found that the LTFV imports could not be blamed for the decline. The Commission observed that 1975 was "a year in which imports of these articles from Japan declined sharply, and where market penetration was very low". Furthermore, the Commission noted that "despite the significant decline in profits in recession year 1975, U.S. tantalum capacitor operations were twice as profitable as the operations of all manufacturers of electrical and electronic equipment in that year". The Commission expected the profits of the U.S. producers to return to the higher levels that prevailed in 1973 and 1974, with continued improvement in demand for capacitors in 1976.

With respect to prices, the Commission found:

> *Prices*—The quantities of sales per order of the Japanese-made tantalum capacitors have been small compared with the quantities of sales of U.S. producers of tantalum capacitors. In general, Japanese sales did not exceed 100,000 to 200,000 units per month, whereas orders placed with U.S. producers were frequently for a million or more units per month. While price plays a significant role in what company receives the order, the effect of the small-sized orders for the Japanese tantalum capacitors is insignificant on prices of the total U.S. industry. The small decline in U.S. producers' prices for some types of tantalum capacitors in late 1975 and early 1976 from a peak in 1974 stemmed from the decreased demand occurring after a substantial buildup in inventories by OEM purchasers in 1974 and 1975 and not from LTFV imports.

Finally, the Commission majority found there was no likelihood of injury as a result of the LTFV imports, notwithstanding a planned expansion of Japanese capacity to produce tantalum capacitors in 1976 and 1977, and an anticipated increase in 1977 exports by one Japanese producer. The Commission noted that during the first half of 1976, domestic shipments increased 38 percent, and continued growth in U.S. demand was anticipated. Continuing, the Commission observed:

> The projected sharp growth in demand for tantalum capacitors is not confined to the United States but is expected to occur

also in Japan and other major markets. Thus, only a limited share of the increased production in Japan will be available for export to the United States. Under these conditions, even though the Japanese increase their exports to the United States, it is doubtful that they will increase their share of the expanding U.S. market for tantalum capacitors to the extent that such imports from Japan would be an identifiable cause of any injury which the relevant domestic industry may suffer in the future.

In dissent, Commissioner Parker submitted a separate Statement of Reasons for an affirmative determination of likelihood of injury. In support of his affirmative determination, Commissioner Parker noted the increased Japanese capacity to produce tantalum capacitors, the planned increases in Japanese exports, and the expected intensification of competition between the domestic producers and the Japanese exporters.

### III

In its Statement of Reasons, the Commission (majority) considered reasonable criteria in determining whether injury or the likelihood thereof existed. It is readily apparent from the majority's factual findings that the domestic tantalum capacitor industry was experiencing several adverse economic developments. Nevertheless, the administrative record before the Commission at the time of its determination shows a rational basis for the Commission's conclusion: "any injury which the domestic industry may be experiencing or may be likely to experience is not by reason of LTFV imports". However, the deeply disturbing fact remains that the Commission in making its determination relied upon substantially erroneous import statistics provided by the Bureau of Census which grossly understated the true volume of tantalum capacitor imports,[2] and that the Commission's notice of February 9, 1979 (44 FR 8359)

states, without giving any reason, that no further action would be taken respecting its original negative determination. Inasmuch as the official statistics before the Commission at the time of its determination grossly understated the tantalum electrolytic fixed capacitor imports, and the LTFV imports comprised a certain percentage of the former (viz., 35 percent), it logically follows that the LTFV imports and the domestic consumption thereof were substantially greater than the figures assumed by the Commission.

Under the Antidumping Act the Commission is charged by Congress with the responsibility for making an investigation, evaluating pertinent economic data bearing upon the question of injury or the likelihood thereof, and making a determination, either affirmative or negative. Whether the true volume of LTFV imports disclosed by the corrected statistics would warrant a finding by the Commission that there was injury "by reason of" sales at LTFV, and thus compel an affirmative determination, is a matter for the Commission's consideration and expert judgment. If, in light of the correct import statistics, the Commission can still demonstrate a rational basis for a negative determination, this Court will be obliged to sustain such determination.

■ I agree with defendant's contention that if the Commission's original determination cannot be sustained by the Court because of the incorrect import statistics, an appropriate remedy would be to stay the proceedings in this Court pending a new determination by the Commission in light of the correct statistical information. See *United States v. Bianchi & Co.*, 373 U.S. 709, 718 (1963). See also *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). *Cf. SCM Corporation v. United States (Brother International Corporation, Party-in-Interest )*, 84 Cust.Ct. ——, C.R.D. 80–2 (1980); *Voss International Corp. v. United States*, 78 Cust.Ct. 130, C.D. 4698, 432 F.Supp. 205 (1977) (case remanded to

---

2. Certified copy of memorandum dated June 13, 1977, annexed to plaintiff's brief as part of collective exhibit 2.

Commission at previous stage in the proceeding).

 Inasmuch as the Commission was informed of its use of erroneous import statistics but nonetheless declined to take further action, without explanation, defendant's reliance upon the well established rule that an administrative decision may not be judicially overturned on the basis of a new record made initially in the reviewing court[3] is patently misplaced.

### IV

As we have seen, the Commission majority noted in its Statement of Reasons that:

[I]n determining the impact of LTFV sales of tantalum capacitors from Japan on the relevant U.S. industry, we have excluded from consideration imports of tantalum capacitors of Matsushita Electric Industrial Co., Ltd., as Treasury has done from its LTFV determination, and have considered the impact of 35 percent of the remaining tantalum capacitor imports from Japan, since this is the percentage which Treasury actually found to be sold at LTFV after looking at about 75 percent of such imports during the period of investigation. References to import statistics and import penetration in this statement reflect this finding.

 We now turn to plaintiff's argument that the majority of the Commission "impermissibly fragmented the relevant product group". On this score, plaintiff contends that the Commission was required by the Antidumping Act to consider the impact on the domestic industry of the *entire class or kind of merchandise involved*, whether or not sold at LTFV (other than the capacitors produced and sold by Matsushita). Defendant, however, insists that the Commission acted properly in considering the impact on the domestic industry of only the LTFV imports. I agree with defendant's construction of the statute.

3. See *FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1975), and cases cited.

4. Hence, plaintiff's position, if carried to its logical conclusion, would require the Commission to investigate the impact on the domestic

The Antidumping Act requires the Treasury to advise the Commission whenever it "determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States * * * at less than its fair value * * *". The Commission is thereupon directed to "determine * * whether an industry in the United States is being or is likely to be injured * * * by reason of the importation of such merchandise into the United States". 19 U.S.C. § 160(a).

The statute, essentially, is intended to protect the domestic industry from international price discrimination, and requires a finding by the Commission that injury, or the likelihood thereof, is "by reason of" imports at LTFV. As recently stated by Chief Judge Re in his well-reasoned decision in *SCM Corporation v. United States (Brother International Corporation, Party-in-Interest), supra*:

If the Secretary issues an affirmative finding of sales at less than fair value, the matter is referred to the International Trade Commission. The Commission must then determine whether an industry in the United States is being or is likely to be injured, or is prevented from being established, *by reason of the less than fair value sales*. * * * [Emphasis added.]

Thus, the Act is not designed to ameliorate all of the effects of import competition, and the Commission is required to focus its investigation on the impact of LTFV imports. Plaintiff's reading of the statute would require the Commission to investigate the impact of the entire class or kind of merchandise involved in Treasury's LTFV investigation, notwithstanding that Treasury may have found LTFV margins on only a percentage of the imports investigated.[4] Plainly, this interpretation was not

industry of 100 percent of the class or kind of merchandise involved in Treasury LTFV investigation even though only 1 percent of the involved merchandise was found by Treasury to be sold at LTFV.

intended by Congress. In this connection, it may be noted that Congress has provided different forms of relief, other than the Antidumping Act, for imports sold at fair value. See e. g. sections 201 and 406 of the Trade Act of 1974.

While the statute provides that Treasury must determine whether a "class or kind of foreign merchandise" is being or is likely to be sold at LTFV, I am clear that it is the LTFV imports that must be the subject of the Commission's injury investigation.[5] Accordingly, I conclude that the Commission majority did not err in considering the impact of only the percentage of imports of tantalum electrolytic capacitors from Japan which Treasury actually found to be sold at LTFV.

Footnote 3 of the majority's Statement of Reasons states (41 FR 47605):

During the investigation the Commission learned that Nippon Electric Co. (NEC) intended to increase its exports of tantalum capacitors to the United States significantly during 1977. However, the increase in such exports to the United States (estimated to be several millions of units) will consist almost entirely of epoxy dipped fixed capacitors. Information furnished to the Commission by the Department of the Treasury contained in a letter dated July 7, 1976, from the U.S. Customs Service to Assistant Secretary David R. Macdonald, states "NEC sold hermetically sealed and epoxy dipped capacitors and margins were found only on the hermetically sealed capacitors." *Therefore, since no LTFV margins were found in NEC sales of epoxy dipped capacitors, Commissioners Moore and Bedell believe that NEC's anticipated increase in exports of such capacitors to the United States should not be used as a basis for a*

*finding of likelihood of injury.* [Emphasis added.]

For the same reason I concluded that the Commission majority did not err in investigating the impact on the domestic industry of only the LTFV imports, I agree with the approach of Commissioner Moore and Commissioner (now Chairman) Bedell in their finding of no likelihood of injury. Since Treasury found no LTFV margins on Nippon's sales of epoxy dipped capacitors,[6] the anticipated increase in exports of such capacitors to the United States should not be used as a basis for a finding of likelihood of injury. Stated differently, since no margins were found by Treasury on Nippon's sales of epoxy dipped capacitors, there could be no basis under the statute for finding that any likelihood of injury was "by reason of the importation of such merchandise [LTFV imports] into the United States".

## CONCLUSION

For the reasons stated herein, it is hereby ordered that:

1. Plaintiff's motion and defendant's cross-motion for summary judgment are denied at this time;

2. Proceedings in the instant case shall be stayed pending a reconsideration by the Commission of its original determination in Investigation No. AA1921–159 and the taking of a new vote on the question of whether, in light of the correct import statistics for tantalum electrolytic fixed capacitors from Japan, sales of such merchandise at LTFV were injuring or were likely to injure an industry in the United States within the meaning of the Antidumping Act of 1921, as amended; and the Commission may conduct any further proceedings which it

**5.** Although the statute makes injury by reason of LTFV imports the focus of the Commission's antidumping investigation, the Commission clearly has discretionary authority to investigate whether imports of the same class or kind sold at fair value are potentiating the capacity of the LTFV imports to cause injury.

**6.** Notwithstanding that Treasury found no margins on the sale of Nippon's epoxy dipped capacitors, Treasury declined to grant Nippon's request to have the LTFV determination severed between different types of tantalum capacitors and, in effect, to eliminate from Treasury's LTFV determination tantalum electrolytic fixed capacitors identified or described as "dipped".

deems appropriate, but consistent with this order;

3. The Commission shall, through counsel for defendant, submit to the Court within 90 days from the date of entry of this order its new determination, whether affirmative or negative, together with a complete statement of findings and conclusions, and the reasons or bases therefor, on all material issues of fact or law presented, including the materiality of the corrected import statistics on the Commission's new determination.