Memorandum and Order on Plaintiff’s Motion for Summary Judgment and Defendant’s Cross-Motion for Summary Judgment
 

 NEWMAN, Judge:
 

 INTRODUCTION
 

 The within action is again before this Court following my remand to, and reconsideration by, the United States International Trade Commission (“Commission”) of its negative injury determination under the Antidumping Act of 1921, as amended (19 U.S.C. §§ 160,
 
 et seq.
 
 (1970)) (“Antidumping Act”) in Investigation No. AA1921-159 (41 FR 47604 (1976)). That investigation involved tantalum electrolytic fixed capacitors imported from Japan. See
 
 Sprague Electric Company v. United States (Capar Components Corp., Party-in-Interest),
 
 84 Cust.Ct. 243, C.R.D. 80-3, 488 F.Supp. 910,
 
 modified on rehearing,
 
 84 Cust.Ct. 260, C.R.D. 80-6 (1980).
 

 Pending for decision are plaintiff’s motion for summary judgment and defendant’s cross-motion for summary judgment. For the reasons indicated, plaintiff’s motion is denied, and defendant’s cross-motion is granted.
 

 BACKGROUND
 

 Plaintiff is a domestic manufacturer of tantalum electrolytic fixed capacitors. On September 24, 1975 plaintiff, through counsel, submitted a complaint to the Commissioner of Customs alleging that tantalum electrolytic fixed capacitors from Japan were being sold at less than fair value (“LTFV”) within the meaning of the Anti-dumping Act. Following an investigation, the Department of the Treasury determined on. July 27, 1976 that tantalum electrolytic fixed capacitors (other than those produced and sold by Matsushita Electric Industrial Company, Ltd. (“Matsushita”) from Japan were being or likely to be sold at LTFV within the meaning of the Antidumping Act (41 FR 31240 (1976)).
 

 Thereafter, the Commission conducted an investigation to determine whether a domestic industry was being or was likely to be injured or was prevented from being established by reason of the importation of tantalum electrolytic fixed capacitors from Japan at LTFV. On October 22, 1976 a six-member Commission by a vote of 5 to 1 reached a negative determination, viz., the Commission majority determined that an industry in the United States was not being or likely to be injured or prevented from being established by reason of the LTFV imports (41 FR 47604 (1976)) (hereinafter
 
 “Tantalum
 
 J”).
 

 On September 14, 1977 plaintiff commenced this action challenging the Commission’s negative injury determination, alleging
 
 inter alia
 
 that the Commission relied upon false import statistics which underrepresented the true magnitude of LTFV imports.
 
 [1]
 

 
 *672
 
 On August 22, 1978 the Commission published notice of the erroneous import statistics and invited the public to comment upon “whether the Commission’s reliance on erroneous official statistics justifies further Commission action with respect to its determination in investigation No. AA1921-159” (43 FR 37233 (1978)).
 

 On February 9, 1979 the Commission announced that no further action would be taken relative to its negative determination (44 FR 8359 (1979)).
 

 On May 15, 1979 plaintiff filed its motion for summary judgment and shortly thereafter, defendant filed its cross-motion for summary judgment. These motions culminated in an order of the Court, entered on March 27, 1980, which provides:
 

 1. Plaintiff’s motion and defendant’s cross-motion for summary judgment are denied at this time;
 

 2. Proceedings in the instant case shall be stayed pending a reconsideration by the Commission of its original determination in Investigation No. AA1921159 and the. taking of a new vote on the question of whether, in light of the correct import statistics for tantalum electrolytic fixed capacitors from Japan, sales of such merchandise at LTFV were injuring or were likely to injure an industry in the United States within the meaning of the Antidumping Act of 1921, as amended; and the Commission may conduct any further proceedings which it deems appropriate, but consistent with this order;
 

 3. The Commission shall, through counsel for defendant, submit to the Court within 90 days from the date of entry of this order its new determination, whether affirmative or negative, together with a complete statement of findings and conclusions, and the reasons or bases therefor, on all material issues of fact or law presented, including the materiality of the corrected import statistics on the Commission’s new determination. [84 Cust.Ct. at 254-55, 488 F.Supp. 910.]
 

 Subsequently, on April 25, 1980 plaintiff filed a motion for rehearing, and in a decision dated May 23, 1980 (C.R.D. 80-6) this Court ordered, so far as pertinent:
 

 1. That plaintiff’s motion for rehearing be granted to the extent that the Commission is directed to consider in its deliberations on remand the effect of Nippon Electric Company’s plans to increase productive capacity for, and exportation to the United States, of epoxy dipped tantalum electrolytic fixed capacitors.
 

 After receipt of the Court’s order, as modified, the Commission published an invitation for comments “on the question of whether the Commission’s earlier determination in investigation No. AA1921 — 159, Tantalum Electrolytic Fixed Capacitors From Japan, should change by virtue of considering ‘epoxy dipped’ tantalum electrolytic fixed capacitors exported to the United States by Nippon Electric Company to be within the class or kind of merchandise found by the Department of the Treasury to have been sold or likely to be sold at less than fair value” (45 FR 41249-50 (1980)).
 

 On August 6, 1980 a five-member Commission determined, two Commissioners dissenting, “that as of October 22, 1976, the date of the Commission’s earlier determination regarding tantalum electrolytic fixed capacitors from Japan, an industry in the United States was not being and was not likely to be injured, and was not prevented from being established, by reason of the importation of tantalum electrolytic fixed capacitors from Japan sold, or likely to be sold, at less than fair value within the meaning of the Antidumping Act, 1921, as amended.” (45 FR 58729 (1980)) (hereinafter
 
 “Tantalum II”).
 

 In their joint statement of views, Chairman Alberger, Vice Chairman Calhoun, and Commissioner Stern, none of whom was a Commissioner when the first determination was rendered, offered this explanation:
 

 
 *673
 
 In arriving at its determination in this matter, the Commission has given due consideration to written submissions received from interested persons, information obtained during the course of investigation No. AA1921-159, and the corrected official import statistics for tantalum electrolytic fixed capacitors from Japan for the period Janury 1975 through June 1976 as reported by the Bureau of Census. With the exception of the corrected import statistics, the Commission has not considered any information obtained subsequent to the date of the earlier determination.
 

 * * * * * *
 

 In accordance with the instructions of the United States Customs Court [since November 1, 1980, the United States Court of International Trade] we have reviewed the confidential staff report of September 1976 and the statement of reasons in the Commission’s report on
 
 Tantalum Electrolytic Fixed Capacitors,
 
 USITC Publication 789, October 1976, as revised to reflect corrected import statistics. In our deliberations we have considered all imports of tantalum electrolytic fixed capacitors from Japan less those from Matsushita Electrical Industrial Co., Ltd., as sales at less than fair value (LTFV) for the purpose of addressing present and future injury.
 

 We are persuaded that any injury suffered by the U.S. industry as of October 22, 1976, was not caused or likely to be caused by LTFV imports of tantalum electrolytic fixed capacitors (tantalum capacitors), but rather by the recessionary forces at work in the electronics industry. Taking into account the corrected import statistics, as well as the modification of the content of LTFV sales, we believe that the penetration of the U.S. market and the underselling of U.S. producers were not of sufficient magnitude to warrant a determination of injury by reason of LTFV sales.
 

 The successor Commissioners proceeded to state that the evidence bearing on the existence of present injury indicated that although LTFV imports increased in the first six months of 1976 after having declined in 1975, other indices showed “a concurrent improvement in the health of the U.S. industry.” They then noted that with respect to the first six months of 1976 these other indices showed that (a) domestic consumption of tantalum capacitors had increased, (b) capacity utilization rates were growing in the domestic industry, and (c) the domestic producers accounting for the “bulk” of United States production were experiencing increasing profits and high ratios of net operating profits to net sales. The new Commissioners further found that (a) increases in shipments of domestically produced tantalum capacitors exceeded the market gains achieved by LTFV imports throughout 1974-76; (b) “[o]nly the major supplier of LTFV capacitors consistently undersold domestic producers;” and (c) the frequency of actual sales of imports at LTFV was too low to cause the loss of sales to domestic producers. Additionally, in their findings of fact, the new Commissioners observed that “[ajlthough LTFV imports from Japan increased as a share of the U.S. market for tantalum capacitors throughout the period of investigation, at no time did the share of total U.S. consumption held by LTFV imports equal 10 percent.” Regarding the likelihood of injury, the successor Commissioners stated:
 

 Information obtained during the investigation indicated that Japanese producers were increasing their capacity to produce tantalum capacitors in 1976 and 1977 and that some of the increased production would likely be exported to the United States. The information was obtained from three separate sources and was incomplete in that data from each source could not be correlated with the other sources. Further, the estimated increased capacity was not related to a base capacity such that the magnitude of the capacity increase could be quantified reliably. We believe that the information available to the Commission was not sufficient to impute a likelihood of injury. To the contrary, the domestic industry— growing before the recession — gave every
 
 *674
 
 indication that it was again growing in January-June 1976 after the recession abated. During the recession, the industry producing tantalum capacitors fared much better than the electronics industry as a whole.
 

 Consideration of Nippon Electric Company’s
 
 plans
 
 to increase productive capacity for, and exportation to the United States of, epoxy dipped tantalum capacitors in and of itself does not establish grounds for a determination of likelihood of injury by reason of LTFV sales. We do not believe that an increase in the capacity of Japanese producers to manufacture tantalum electrolytic fixed capacitors portended a threat to a strong and growing industry in the United States. The evidence gathered by the Commission regarding any increased exports from Japan did not show real and imminent threat to the domestic industry. [Emphasis in original; footnote omitted.]
 

 Commissioners Moore and Bedell dissented. In 1976, they had cast negative votes in
 
 Tantalum I,
 
 and comprised part of the then five-member majority. In their Statement of Reasons for Affirmative Determinations in
 
 Tantalum II,
 
 Commissioners Moore and Bedell commented:
 

 When the Commission determined by a 5-1 vote in October 1976 that an industry in the United States was not being injured and was not likely to be injured by imports of tantalum electrolytic fixed capacitors from Japan sold, or likely to be sold, at less than fair value (“LTFV”), we voted with the majority. Our negative determinations at that time were based in part on official import statistics for tantalum capacitors from Japan subsequently discovered to have been substantially underreported and in part on our view that the anticipated increase in exports to the United States of “epoxy dipped” tantalum electrolytic fixed capacitors manufactured by Nippon Electric Co. (“NEC”) should not be used as a basis for finding likelihood of injury. Our view in the latter regard was based on the fact that the Treasury Department had found no margins on NEC’s sales of epoxy dipped capacitors.
 

 ******
 

 In reconsidering our earlier determinations in light of the Customs Court’s decisions, we find ourselves in substantial agreement with the dissenting views of former Commissioner Parker on the question of likelihood of injury. Thus, we now find that, as of the date of the Commission’s earlier determination, an industry in the United States was likely to be injured by reason of the importation from Japan of tantalum electrolytic fixed capacitors which the Treasury Department had determined were likely to be sold at LTFV. [Footnote omitted.]
 

 Commissioners Moore and Bedell explained their reversal:
 

 In accordance with what we believe to be our mandate from the Customs Court, we have considered the class or kind of merchandise sold, or likely to be sold, at LTFV in this case to be all Japanese tantalum electrolytic fixed capacitors except those sold by Matsushita Electrical Industrial Co., Ltd. The combined effect of considering (I) all Japanese capacitors except those sold by Matsushita and (2) the revised import statistics, is to almost triple the ratio of LTFV imports to apparent U.S. consumption for 1975 and the first six months of 1976. * * * It is evident from these figures that the portion of U.S. apparent consumption accounted for by LTFV imports increased steadily during the period January 1972 through June 1976. We regard this increasing trend as an important indication that the U.S. Tantalum capacitor industry was faced in October 1976 with the likelihood of injury.
 

 OPINION
 

 I.
 

 Plaintiff contends that as a matter of law the Commission should be deemed to have made an affirmative determination. Simply stated, it is plaintiff’s hypothesis that had Commissioners Moore and Bedell
 
 *675
 
 known in 1976 what they knew of the facts and the law upon reconsideration of the case in 1980, they would have voted with Commissioner Parker, and an affirmative determination would have been reached by virtue of a tie-vote. See 19 U.S.C. § 160(a).
 

 Plaintiff’s contention arises from the following factual background:
 

 On October 22, 1976 a full six-member Commission, voting five to one, made a negative determination in
 
 Tantalum Capacitors I.
 
 The dissenter was Commissioner Parker who determined that there was likelihood of injury to the domestic industry by reason of LTFV sales. This dissent was based essentially upon the trend in LTFV imports since 1972, and the known plans of the Japanese to increase their productive capacity for, and exportation to the United States of, tantalum capacitors in 1976 and 1977. In assessing the significance of the future plans of the Japanese, Commissioner Parker considered Nippon’s plans respecting epoxy dipped tantalum capacitors. Treasury had not found LTFV margins on sales of Nippon’s epoxy dipped tantalum capacitors, but Treasury expressly refused to exclude them from the scope of its LTFV determination. Nippon had failed to submit appropriate information on its sales of this type of tantalum capacitor during Treasury’s LTFV investigation, and consequently, Treasury concluded that Nippon had failed to show that its epoxy dipped tantalum capacitors had not been sold at LTFV. Commissioner Parker believed that the Commission was without authority to modify or refine the class or kind of merchandise subject to Treasury’s LTFV determination.
 

 The majority in the 1976 vote consisted of (then) Chairman Leonard, (then) Vice Chairman Minchew, (then) Commissioner Ablondi, and Commissioners Moore and Be-dell. Of these five, only Commissioners Moore and Bedell continued on the Commission when the second vote was taken in this case in 1980. In plaintiff’s view, this circumstance is crucial. In the 1976 vote, Commissioners Moore and Bedell disagreed with Commissioner Parker’s belief in the Commission’s lack of authority to modify or refine a class or kind of merchandise that the Commission was obliged to consider. Further, Commissioners Moore and Bedell explained in part their votes by stating that since Nippon’s epoxy dipped tantalum capacitors were not found to be sold at specific LTFV margins, Nippon’s plans regarding this type of tantalum capacitor “should not be used as a basis for a finding of likelihood of injury.”
 

 As previously noted, by an order dated March 27, 1980 (C.R.D. 80-3, 488 F.Supp. 910), which order was subsequently modified on May 23,1980 (C.R.D. 80-6), this case was remanded to the Commission with directions that it reconsider its original determination. The Commission’s new vote was taken on August 6, 1980. A five member Commission, voting three to two, reaffirmed the original negative determination. However, the two dissenting votes — which were affirmative determinations of the likelihood of injury — were cast by Commissioners Moore and Bedell.
 

 In this setting, plaintiff advances the novel argument that in the exercise of its equity powers, this Court should recognize that the successor Commissioners — Alberger, Calhoun, and Stern (who voted in the negative in
 
 Tantalum II)
 
 — stepped into the shoes of ex-Commissioners Leonard, Min-chew and Ablondi (who had voted in the negative in
 
 Tantalum I);
 
 and that the affirmative votes of Commissioners Moore and Bedell in
 
 Tantalum II
 
 coupled with the affirmative vote of Commissioner Parker in
 
 Tantalum .1
 
 result in a tie-vote. Interestingly, under the Antidumping Act, “the Commission shall be deemed to have made an affirmative determination if the Commissioners of the Commission voting are evenly divided as to whether its determination should be in the affirmative or in the negative”. 19 U.S.C. § 160(a). Thus, in effect, plaintiff asks this Court to close its eyes to the obvious facts that the Commission voting after remand in 1980 was comprised of five members rather than six (as in 1976); that Commissioner Parker was not a member of the Commission voting in
 
 *676
 
 1980; and that in
 
 Tantalum II
 
 a majority of the Commissioners voting had cast their vote in the negative.
 

 Plainly, plaintiff’s argument is untenable. This Court is not required to, and will not under these facts and circumstances, hypothesize or speculate how the 1976 Commission or any of its members would have voted were there no error of facts or law. This case was remanded to the 1980 Commission for reconsideration, and Parker was not a Commissioner of “the Commission voting” in 1980. Hence, Commissioner Parker’s vote does not fall within the tie-vote provision in 19 U.S.C. 160(a). Moreover, plaintiff acknowledges that it has no legally cognizable interest in the composition of the Commission’s membership (Cf.
 
 Porter & Dietsch, Inc. v. F. T. C.,
 
 605 F.2d 294, 298 (7th Cir. 1979),
 
 cert. denied,
 
 445 U.S. 950, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980); and more, that the Commission is an ongoing entity whose changing membership does not affect its power to discharge its statutory duties (Cf.
 
 Gamble-Skogmo, Inc. v. Federal Trade Commission,
 
 211 F.2d 106, 112 (8th Cir. 1954);
 
 Louie Lung Gooey v. Nagle,
 
 49 F.2d 1016 (9th Cir. 1931)).
 

 In short, this Court will not review a determination predicated upon a hypothetical tie-vote, but is bound to review the Commission’s
 
 actual
 
 1980 determination upon remand. Importantly, that 1980 determination was negative as to both existing injury and likelihood of injury by virtue of a majority vote of the five member Commission.
 

 II.
 

 Plaintiff also challenges the determination of the Commission majority in
 
 Tantalum II
 
 on the ground that the new Commissioners allegedly failed to consider the record as a whole. According to plaintiff, the new Commissioners considered only the staff report and the original statement of reasons in
 
 Tantalum I.
 
 This argument is predicated solely upon the following portion of the majority’s statement of reasons in
 
 Tantalum II:
 

 In accordance with the instructions of the United States Customs Court, we have reviewed the confidential staff report of September 1976 and the statement of reasons in the Commission’s report on
 
 Tantalum Electrolytic Fixed Capacitors,
 
 USITC Publication 789, October 1976, as revised to reflect corrected import statistics.
 

 But as evident from the foregoing, the statement of views of the new Commissioners does not state that they considered
 
 only
 
 the staff report and the October 1976 statement of reasons, as urged by plaintiff.
 

 Defendant points to the following portion of the Commission’s new determination and statement of reasons as indicating that the entire record was considered:
 

 In arriving at ita determination in this matter, the Commission has given due consideration to written submissions received from interested persons, information obtained during the course of investigation No. AA1921-159, and the corrected official import statistics for tantalum electrolytic fixed capacitors from Japan for the period January 1975 through June 1976 as reported by the Bureau of Census. With the exception of the corrected import statistics, the Commission has not considered any information obtained subsequent to the date of its earlier determination
 

 Reading the above-quoted paragraphs together, and absent any showing to the contrary, I find that the Commission considered the entire record, as asserted by defendant.
 

 III.
 

 We turn to the issue of whether the Commission’s 1980 negative determination is supported by substantial evidence.
 

 The negative determination by the Commission’s majority must be sustained if its findings and conclusions have a rational connection to its determination, and are supported by substantial evidence. Fundamentally, in reviewing an injury determination under the Antidumping Act, this Court
 
 *677
 
 may not weigh the evidence concerning specific factual findings, nor may the Court substitute its judgment for that of the Commission.
 
 Armstrong Bros. Tool Co., et al. v. United States (Daido Corporation, Steelcraft Tools Division, Party-in-Interest),
 
 84 Cust.Ct. 16, C.D. 4838, 483 F.Supp. 312,
 
 aff’d
 
 67 CCPA -, C.A.D. 1252, 626 F.2d 1 68 (1980). See also
 
 Pasco Terminals, Inc. v. United States,
 
 68 CCPA -, C.A.D. 1256, 634 F.2d 610 (1980);
 
 The Budd Company, Railway Div. v. United States (Nissho-Iwai American Corp. et ah, Parties-in-Interest),
 
 1 CIT -, Slip Op. 80-15, 507 F.Supp. 997 (1980).
 

 It is apparent that even after considering the correct import statistics and the appropriate class or kind of LTFV imports (see C.R.D. 80-3, 488 F.Supp. 910 and C.R.D. 80-6), not a single Commissioner concluded that an American industry was being injured by the LTFV imports. The Commission majority found that “any injury suffered by the U.S. industry as of October 22, 1976, was not caused or likely to be caused by LTFV imports of tantalum electrolytic fixed capacitors (tantalum capacitors), but rather by the recessionary forces at work in the electronics industry. Taking into account the corrected import statistics, as well as the modification of the content of. LTFV sales, we believe that the penetration of the U.S. market and the underselling of U.S. producers were not of sufficient magnitude to warrant a determination of injury by reason of LTFV sales.’’ The findings and conclusions of the Commission respecting the existence of injury are supported by substantial evidence and the negative determination is sustained.
 

 Moreover, I find no error respecting the majority’s negative determination of likelihood of injury. A determination concerning likelihood of injury involves a prognostication requiring a high degree of financial and economic expertise. Injury determinations under the Antidumping Act are committed by Congress to the sound discretion of the Commission; and as in most economic and financial prognostications, knowledgeable persons reviewing the same data may differ in their conclusions respecting the outlook for the future. Here, a majority of the 1980 Commission rendered a negative determination as to likelihood of injury, while two members of the Commission dissented.
 

 The trepidations of Commissioners Moore and Bedell concerning,
 
 inter alia,
 
 the increasing trend in the portion of the apparent United States consumption accounted for by the LTFV imports during the period of January 1972 through June 1976, and the prospect of sharply increased exports to the United States of the Japanese tantalum capacitors, has been noted. Nevertheless, I find that the majority Commissioners correctly applied relevant criteria, and that there is a rational connection between the Commission’s findings and conclusions and its negative determination respecting likelihood of injury. Further, I am satisfied that the Commission majority’s negative determination is supported by substantial evidence.
 

 In their statement of reasons, the majority Commissioners referred to the information obtained during the investigation which indicated that the Japanese producers were increasing their capacity to produce tantalum capacitors in 1976 and 1977, and that some of the increased production would likely be exported to the United States. However, the majority Commissioners found that the magnitude of the projected increase in productive capacity of the Japanese producers in 1976 and 1977 could not be reliably quantified, and the majority did not consider the information before them sufficient to impute a likelihood of injury.
 

 Significantly, the basic thrust of the majority’s rationale on the question of likelihood of injury is that the domestic industry was strong and growing again in January to June 1976 after the recession had abated. And as pointed out by the majority, during the recession the industry producing tantalum capacitors fared much better than the electronics industry as a whole. Despite Nippon Electric Company’s expansion plans and the increase in capacity of Japanese
 
 *678
 
 producers to manufacture tantalum capacitors, the Commission majority concluded that no threat of injury was portended. Thus, the Commission majority stated: “The evidence gathered by the Commission regarding any increased exports from Japan did not show real and imminent threat to the domestic industry” (45 FR 58730-31). The Commission concluded,
 
 inter alia,
 
 that “[o]ur determination is not materially affected either by consideration of the corrected import statistics or by the change in the class or kind of merchandise covered by the final LTFV sales determination of the Department of the Treasury”.
 
 [2]
 

 In summary, the majority’s negative determination is supported by these findings of fact:
 

 1. The increase in domestic producers’ shipments after the recession (finding of fact 6).
 

 2. The increase in domestic consumption after the period of the economic downturn (finding of fact 7).
 

 3. The increase in market share held by the domestic producers, which continued to increase in January to June 1976 (finding of fact 8).
 

 4. The increased sales and profitability of the domestic producers during January to June 1976 as compared with the first half of 1975, and the profit-to-sales ratio of the domestic industry which was twice the level achieved by all makes of electrical and electronic equipment in 1976 (finding of fact 9).
 

 5. The decline in year-end inventories from 1974 to 1975 (finding of fact 10).
 

 6. The increased employment by domestic producers during January to June 1976 (finding of fact 11).
 

 7. The recovery of capacity utilization by the domestic producers (finding of fact 12).
 

 In essence, the evidence before the Commission indicated that the domestic industry emerged from the recession in a strong condition, and that it would grow in the future. This rationale applied by the Commission majority in its negative determination is appropriate; and the Court is satisfied that substantial evidence supports the negative determination. Hence, that determination is sustained.
 

 For the foregoing reasons, plaintiff’s motion for summary judgment is denied; defendant’s cross-motion for summary judgment is granted; and this action is dismissed.
 

 Judgment will be entered accordingly.
 

 [1]
 

 . There is no dispute that in
 
 Tantalum I,
 
 the import statistics before the Commission were erroneous. The Foreign Trade Division of the Bureau of the Census conducted an investigation of the accuracy of import statistics for tantalum electrolytic fixed capacitors from Japan by calendar quarters for 1975 through mid-1977. The investigation showed that for 1975 the actual volume of such imports was 21,814,-079 units, whereas the erroneously reported volume of such imports during 1975, upon which the Commission relied, was 14,948,243
 
 *672
 
 units. This translates into an increase in market penetration from 4.6 percent to 6.6 percent. Further, the investigation showed that for the first half of 1976 the actual volume of such imports was 19,328,083 units, whereas the erroneously reported volume of such imports during this period upon which the Commission relied was 13,769,411 units.
 

 [2]
 

 . In my order of March 27, 1980 (C.R.D. 80-3, 488 F.Supp. 910) the Commission’s Statement of Reasons was required to disclose the materiality of the corrected import statistics on its new determination.